761 A.2d 335

**David P. SELBY**

v.

**STATE of Maryland.**

**Nos. 12, Sept. Term, 2000.**

Court of Appeals of Maryland.

Nov. 6, 2000.

**320**

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

HARRELL, Judge.

Charged with murdering his ex-girlfriend, eighteen-year-old David Paige Selby (Petitioner) was acquitted in 1987 at a

bench trial in the Circuit Court for Prince George's County of first degree and second degree murder, but convicted of voluntary manslaughter and the use of a handgun in the commission of a felony. Granted a belated appeal on 19 June 1998 in the course of a post conviction proceeding, Petitioner now argues that the trial court should not have found him guilty of voluntary manslaughter after finding as fact that he did not intend to kill his ex-girlfriend, Michelle Barber. The Court of Special Appeals rejected Petitioner's argument and affirmed the lower court's conviction in an unreported opinion filed 27 December 1999. We granted Selby's petition for writ of certiorari on 12 April 2000 to determine whether the elements of voluntary manslaughter were present in this case, given the trial court's findings of fact. We shall reverse the judgments of the intermediate appellate court and the Circuit Court.

Petitioner presents us with the same issue presented to the intermediate appellate court:

Whether the trial court erred in convicting petitioner of voluntary manslaughter and use of a handgun in the commission of a felony after finding as fact that he did not intend to kill the victim.

I.

Evidence adduced during the 1987 trial revealed that Selby and Ms. Barber met in a detention home[1] and began a romantic relationship at age 16. They dated for two years, during which time they produced a child. Barber ended their relationship in July 1986, but maintained contact with Selby on matters regarding their infant son.

The record reflects a chain of emotionally charged events that led up to Barber's death on 11 August 1986. On 2 August 1986, Petitioner met Barber and their son at a pediatrician's

---

1. At age fifteen, Petitioner was judged a Child in Need of Supervision and placed in a Group Home in Fairfax, Virginia. The record does not reflect how Barber came to reside there.

office to discuss Barber's return of certain items belonging to Petitioner, including a necklace of his. Barber refused to give Petitioner a necklace of hers that she was wearing; in the midst of their disagreement, Petitioner admits to grabbing at the necklace around Barber's neck and threatening to kill her.[2] Although the police were called,[3] Petitioner left the scene prior to their arrival, and Barber chose not to make a report.

At approximately 3:00 AM on 3 August 1986, Petitioner went to Barber's apartment to collect his belongings. According to Earleen Isaac, a friend staying with Barber, Petitioner and Barber argued over cassette tapes and a set of apartment keys while Barber gathered Petitioner's belongings. Isaac testified that Barber called the police because Petitioner would neither return the tape nor leave the apartment. Officer Brian Berdeguez, the officer responding to the call, testified that the police, after running a background check on Petitioner and finding no outstanding warrants, escorted Petitioner off the premises. According to Officer Berdeguez, Petitioner warned Barber as he left that "calling the police on him was the biggest mistake she could ever make and that he would be back." Petitioner denied making this threat.

Petitioner called Barber soon after he left the apartment. Isaac, who answered the telephone, testified that Petitioner said Barber's calling the police was the worst thing Barber could have done and that he would kill Barber by Monday. She admitted, however, that neither she nor Barber took Petitioner's threat seriously. Rather, when told of the threat, Barber "just laughed." Although Petitioner admitted to calling Barber several times that weekend, he denied ever telling

---

2. The testimony from Earlene Isaac and Jamais Ghent, two friends who accompanied Barber to the doctor's office that day, varies as to the level of violence of the fight. Both women agreed, however, that the fight ended with Petitioner grasping at the necklace around Barber's neck, grabbing Barber's throat, and ultimately smashing Barber's head into a wall.

3. According to the testimony of Officer Harold Hickman, Barber "had lacerations to the neck area." He did not notice any other injuries.

Barber she would be dead by Monday. Monday, 4 August 1986, passed with no incident.

On 11 August 1986, Barber called Petitioner to discuss their baby's need for more formula. Their discussion turned into an argument that ended when Petitioner said he would bring more baby formula to Barber's apartment.[4] Petitioner testified that Barber told him to come over at his own risk because his presence would anger her current boyfriend. Packing a blue Nike gym bag with formula, placing his father's loaded gun down the front of his pants, and asking friend Mike Butler to accompany him on the visit, Petitioner ignored Barber's warning and went to the apartment. Petitioner testified that he loved Barber and did not go to her home with the intent to kill; rather, he brought the gun and his friend because he was frightened of Barber's new boyfriend.

Using his key to gain access to Barber's apartment, Petitioner entered and saw two young boys and his son in the front room.[5] Petitioner testified that he entered the back bedroom and woke Barber, who sat up and called him "a stupid mother fucker." Petitioner responded by asking whether Barber's boyfriend was in the apartment. Their conversation quickly escalated into a fight, with Petitioner testifying that Barber threatened to call his mother. Petitioner stated that when he tried to prevent the call by pushing down on the cradle button, Barber hit him on the head with the telephone receiver.

Petitioner testified that the blow to his head knocked him down, and, as he fell, Barber reached and grabbed the gun from the front of his pants. Petitioner lunged at Barber, slamming Barber's bed up against their baby's crib and caus-

---

4. Barber and her child lived with Barber's mother in Suitland, Maryland.

5. Butler claims he did not enter the apartment with Petitioner, but instead remained in the hall, deciding only later to enter to watch television while he waited. The Circuit Court discredited this testimony on this score and found that Butler entered the apartment when Selby did.

ing the gun to fire. Petitioner gained control of the gun, but, as Barber continued to struggle on the bed with the gun pinned beneath her, the gun fired a second time. Petitioner testified that, thinking he shot Barber with the second firing, he grabbed the gun and got up off the bed. As he got up, Barber "reached for the gun ... and then it just went off."

William Albrecht, Jr., a firearms identification specialist with the Federal Bureau of Investigations, testified that three bullets were found in the apartment. One bullet was found in the mattress of the baby's crib, one bullet was found in a pillow on Barber's bed, and one bullet was found in Barber's body. His ballistics report indicated the first bullet penetrated through the crib mattress, ricocheted off the floor and wall, and landed back in the crib mattress. Mr. Albrecht determined that the discharge from the second bullet was "quiet" because it was fired into a pillow, "almost forming like a cocoon around the bullet" that smothered the sound.[6] The third bullet was the shot that killed Barber.

Barber's autopsy indicated she was shot in the upper left side of her chest. The configuration of the abrasions around the bullet wound suggested that the bullet struck something else before it hit Barber in the chest. Because of a grazing gunshot wound to Barber's right hand[7] on the side opposite the thumb and the stippling around that wound that indicated the gun was fired at close range,[8] the pathologist concluded the same bullet caused both the hand and the chest injuries. He opined that Barber's hand was likely in front of her chest, or in "defensive posturing," when it was struck.

---

**6.** The ballistic expert's testimony explains possibly why Butler testified that he heard "fighting," "screaming," and the "bang, bang" of *two* shots of gun fire.

**7.** The trial judge found as fact that "[t]he third shot, however, is into her left hand." Yet, the forensic pathologist, Dr. Gregory Kauffman, testified that "[t]he significant findings were a gunshot wound on the ulnar side of the right hand."

**8.** The pathologist testified the gun was fired between six and eighteen inches away from Barber's hand.

Petitioner testified that Barber, upon being struck by the third bullet, told him to "Call an ambulance. You shot me in the mouth." [9] Prior to calling 911, Petitioner ran into the front room to get Butler and show him what happened. Butler viewed the scene, did not take it seriously, and left the apartment. Petitioner called 911, grabbed the gun and his bag, told the young boys to watch his son, and left the apartment. He met up with Butler in the hallway, where Butler asked what happened to Petitioner's dangling necklace and was told that Barber had broken it. Police quickly responded to Petitioner's 911 call and, upon entering the apartment, found Barber sprawled across the bed, her arms over her head and a gunshot wound in her chest.

Later that night, Petitioner emptied the rest of the bullets from the gun and threw them away. When police stopped him outside of a 7–Eleven to question him about a theft that had recently occurred in the store, Petitioner handed over the gym bag containing the gun to a fifteen-year-old acquaintance for safekeeping, telling her "Here, take your bag with you." After the police left, Petitioner retrieved the bag from the girl and then threw the gun down an elevator shaft.[10] The next day, Petitioner learned from the news that Barber was dead. Petitioner called his parents, who in turn called the police. The police arrested Petitioner that day.

Petitioner was indicted on two counts: common law murder and the use of a handgun in the commission of a felony. He elected a bench trial in the Circuit Court for Prince George's County. The prosecution argued that Petitioner was guilty of premeditated murder. The defense countered that Petitioner never intended to kill Barber, and thus he was not guilty of first or second degree murder. It was the defense's contention that Petitioner, at most, was guilty of involuntary manslaughter.

---

**9.** It is unclear why Barber would have said she was shot in the mouth.

**10.** Petitioner testified that he originally took the gun when he left Barber's apartment because he was "just trying to get it back to [his] father's house because it was [his] father's [gun]...."

The Circuit Court acquitted Petitioner of first and second degree murder, but convicted him of voluntary manslaughter and the use of a handgun in the commission of a felony. In pronouncing the verdict, the Court made the following findings of fact:

In this case, the Court finds that the Defendant went to the apartment clearly at his own risk believing that there was some danger there that was going to be posed in all probability by a boyfriend. He, nevertheless, went with a loaded gun and a sidekick, I am sure, to back him up if he got into any problems with the boyfriend. He did not have that willful and deliberate intent specifically to kill Barber.

The Court had an opportunity to observe Defendant on the witness stand. Together with that observation, you have the fact of him calling 911 almost immediately. You can tell it was instantaneously just about from the records of the police dispatch. The Court heard the call and heard the voice of the Defendant then and heard him on the stand yesterday. Clearly he did not have an intent to kill Barber.

The third shot, however, is into her left hand.[11] His version is that she grabbed the gun and shot the first shot. Presumably that's the one that went into the mattress. He got the gun from her and shot the second shot. Presumably that's the one that went through the pillow.

The third shot went into her. He doesn't remember pulling the trigger. He said it just simply went off. But it all came down because of an argument between the two over the breakup of their relationship, over whether or not the boyfriend had any control over his right to see and care for his son, and certainly over those chains again around their necks, and that in the heat of passion it reduces the murder from one to two manslaughter.

So I find him not guilty of murder in the first degree, not guilty of murder in the second degree but guilty of voluntary manslaughter. Because manslaughter at common law

---

**11.** *But see infra* note 7.

is a felony, then as to the second count of use of a handgun, clearly this was a handgun, and clearly this was a handgun in the commission of a felony. That is a separate and distinct crime, and he is also guilty of that offense as well.

Petitioner appealed the Circuit Court's judgment to the Court of Special Appeals, arguing that he could not be guilty of voluntary manslaughter and the use of a handgun during a felony because he did not have the *mens rea* for the predicate felony. Quoting the Circuit Court, Petitioner contended it would be inconsistent to find him guilty of these crimes when "[c]learly he did not have an intent to kill Michelle."

On 27 December 1999, the intermediate appellate court affirmed Petitioner's convictions. Although it agreed with the Circuit Court that Petitioner did not intend to kill Michelle, it reasoned:

> Appellant's argument overlooks the fact that "there is a difference between the intent that will suffice to prove a consummated murder, and that which is required when death does not result." *State v. Earp*, 319 Md. 156, 163 [571 A.2d 1227] (1990). Although specific intent to kill is required to support an attempted murder conviction, an intent to commit grievous bodily harm will support a murder or manslaughter conviction. *Earp*, at 163 [571 A.2d 1227]. It is well settled that the trial judge is presumed to know the law. Applying that presumption to the factual findings of the trial court, we are persuaded that appellant is not entitled to a reversal of his convictions.

We granted certiorari on 12 April 2000. Petitioner argues that the trial court erred in convicting him of voluntary manslaughter and the use of a handgun in the commission of a felony after finding as fact that he did not intend to kill Barber. The State (Respondent) counters that Petitioner misconstrues the trial judge's opinion, arguing that the verdict implies, with its language of mitigation, a finding by the Circuit Court of Petitioner's intent to kill "in the heat of passion."

## II.

We are called upon in this case to answer three questions concerning whether the Circuit Court erred in convicting Petitioner of voluntary manslaughter and the use of a handgun in the commission of a felony. First, what was the breadth of the trial judge's finding concerning Petitioner's intent? Second, if the judge found that Petitioner did not intend to kill Barber, would there be sufficient evidence to support a conviction of voluntary manslaughter and the layered crime of the use of a handgun in the commission of a felony? Third, was the Court of Special Appeals correct in its apparent interpretation of and reliance on *State v. Earp*, 319 Md. 156, 571 A.2d 1227 (1990), holding that an intent to commit grievous bodily harm would support Petitioner's voluntary manslaughter conviction? For the following reasons, we hold that the Circuit Court found that Petitioner lacked an intent to kill Barber, and that finding precluded him from being convicted of voluntary manslaughter and the use of a handgun during the commission of that felony on this record.

## III.

### A.

 When an appellate court is asked to determine whether sufficient evidence exists to sustain a criminal conviction, it is not the function of the appellate court to review the record in such a way as essentially to retry the case. Rather, we must review the evidence in the light most favorable to the State. *See State v. Albrecht*, 336 Md. 475, 478, 649 A.2d 336, 337 (1994); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We must give due regard to the trial court's findings of facts and its unique opportunity to observe and assess the credibility of witnesses. *See Albrecht*, 336 Md. at 478, 649 A.2d at 337; *State v. Raines*, 326

Md. 582, 589, 606 A.2d 265, 268 (1992); Maryland Rule 8–131(c).[12]

## B.

■ With respect to the first inquiry, the parties dispute whether the Circuit Court found as fact that Petitioner possessed the required *mens rea*—an intent to kill—for a conviction of voluntary manslaughter. Petitioner argues that the Circuit Court clearly found that, based on the record evidence, Petitioner did not intend to kill Barber at any time, including the firing of the fatal third gunshot. Respondent counters that, during the trial, the prosecutor argued that Petitioner was "spoiling for a fight" when he went to Barber's apartment, possessing the specific intent to kill Barber and acting in a willful and premeditated manner. Respondent contends that the Court rejected the prosecutor's argument regarding first degree murder and instead adopted its theory of mitigated homicide, finding Petitioner did not plan to kill Barber, but rather acted in the heat of passion when he fired the third gun shot. Respondent infers from the Circuit Court's mitigation of murder that the Court found an intent to kill in the third gun shot.

We conclude that the record supports Petitioner's argument that the trial court found Petitioner did not possess, at any time, the intent to kill Barber. The trial judge clearly believed Petitioner when he testified that he brought a gun and a friend with him to Barber's apartment because he feared trouble from Barber's new boyfriend. In making this finding, the trial judge rejected Respondent's argument that Petitioner went to the apartment with a premeditated intent to kill Barber, finding "it unbelievable that if [Petitioner] intended to kill Michelle when he left home, he would have taken a witness

---

12. Maryland Rule 8–131 states, in pertinent part:

 *(c) Action Tried Without a Jury.*—When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

with him." Respondent admits, and we agree, that the judge weighed whether Petitioner had a premeditated, willful, and deliberate intention to kill Barber and, finding no evidence other than Petitioner's earlier threatening telephone call to support such intent, concluded Petitioner "did not have that willful and deliberate intent specifically to kill Michelle Barber."

The key to the trial judge's finding that Petitioner did not possess an intent to kill Barber with the third gun shot can be found in the Court's observations of Petitioner, both on the witness stand and on the tape of the 911 call placed "instantaneously" after the third gun shot. Based on what she heard in Petitioner's voice during the call and his testimony, the judge found that "[c]learly he did not have an intent to kill Michelle" when he shot Barber.

As Respondent correctly asserts, the Court went on to find that Petitioner acted in the "heat of passion" when he fired the third gunshot into Barber. A finding of "hot blood," however, is not interchangeable with a finding of an intent to kill.[13] Giving "due regard" to the trial court's findings of facts and its opportunity "to observe and assess the credibility" of Petitioner, *see Albrecht*, 336 Md. at 478, 649 A.2d at 337; *Raines*, 326 Md. at 589, 606 A.2d at 268; Maryland Rule 8–131(c), we conclude that the Circuit Court found Petitioner did not possess, at any time immediately prior to or during the altercation, an intent to kill Barber.

## IV.

### A.

Our role is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318–319, 99 S.Ct. at 2788–89, 61 L.Ed.2d 560; *see also*

---

13. *See infra* Part IV.B.

*Williams v. State,* 342 Md. 724, 734, 679 A.2d 1106, 1111 (1996); *Albrecht,* 336 Md. at 479, 649 A.2d at 337; *Oken v. State,* 327 Md. 628, 661, 612 A.2d 258, 274 (1992); *Raines,* 326 Md. at 588–89, 606 A.2d at 268. Where a trial judge finds as a fact that a necessary element of a crime is lacking, the conviction must be reversed. *See generally State v. Gover,* 267 Md. 602, 607, 298 A.2d 378, 381 (1973).

### B.

The second question in this case, having determined that the Circuit Court found that Petitioner did not intend to kill Barber, is whether the trial court arrived at the proper conclusion of law based upon its factual findings. In answering this question, the parties differ sharply. Petitioner asserts that the Circuit Court stated incorrectly the *mens rea* for voluntary manslaughter and, in so doing, applied the wrong legal standard to its findings when concluding that Petitioner was guilty of voluntary manslaughter of Barber. Petitioner argues that voluntary manslaughter is a specific intent crime, and that the Circuit Court erred in declaring Petitioner guilty of a crime for which he did not possess the requisite intent. Contending again that the Circuit Court found that Petitioner possessed a specific intent to kill Barber, Respondent replies that the judge mitigated murder to manslaughter based on her findings that the third gun shot was fired in the "heat of passion."

For the reasons set forth below, we hold that the Circuit Court erroneously found Petitioner guilty of voluntary manslaughter when it determined that a finding of "hot blood" could be substituted for the necessary element of intent to kill in the crime of voluntary manslaughter.

We first note that the element which distinguishes murder from manslaughter is the presence or absence of malice. *See Girouard v. State,* 321 Md. 532, 538, 583 A.2d 718, 721 (1991) (citing *State v. Faulkner,* 301 Md. 482, 485, 483 A.2d 759, 761 (1984); *State v. Ward,* 284 Md. 189, 195, 396 A.2d 1041, 1045 (1978); *Davis v. State,* 39 Md. 355, 377 (1874)).

Specifically, manslaughter is "the unlawful and felonious killing of another, without malice aforethought, either express or implied, and is either voluntary or involuntary homicide, depending upon the fact whether there was an intention to kill or not." *Neusbaum v. State,* 156 Md. 149, 155, 143 A. 872, 875 (1928) (quoting 1 *Wharton Cr. Law,* para. 421).

The distinction between voluntary and involuntary manslaughter is key to the issue before us in the present case. We have defined voluntary manslaughter as "an *intentional* homicide, done in a sudden heat of passion, caused by adequate provocation, before there has been a reasonable opportunity for the passion to cool." [14] *Girouard,* 321 Md. at 538, 583 A.2d at 721 (citing *Cox v. State,* 311 Md. 326, 331, 534 A.2d 1333, 1335 (1988); *Faulkner,* 301 Md. at 485, 483 A.2d at 761; *Ward,* 284 Md. at 195, 396 A.2d at 1045; *Whitehead v. State,* 9 Md.App. 7, 12, 262 A.2d 316, 319 (1970)); *see also Sims v. State,* 319 Md. 540, 551, 573 A.2d 1317, 1321 (1990). Involuntary manslaughter, on the other hand, has been defined as an *"unintentional* killing done without malice, by doing some unlawful act endangering life, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty." *Cox,* 311 Md. at 331–32, 534 A.2d at 1335–36; *see also Albrecht,* 336 Md. at 499, 649 A.2d at 347. The central element that distinguishes voluntary manslaughter from involuntary manslaughter, therefore, is that intent to kill is an element of the former, but not of the latter.

---

**14.** Both parties note that provocation or "heat of passion" is necessary to mitigate a homicide from murder to manslaughter. They recite the following rule:

1. There must have been adequate provocation;
2. The killing must have been in the heat of passion;
3. It must have been a sudden heat of passion—that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;
4. There must have been a causal connection between the provocation, the passion, and the fatal act.

*Girouard,* 321 Md. at 538, 583 A.2d at 721 (1991); *see Whitehead,* 9 Md.App. at 11, 262 A.2d at 319.

■ We concluded, *supra*, that the Circuit Court found that Petitioner did not intend to kill Barber during their argument. As to this conclusion, we agree with the Court of Special Appeals when it noted that "[t]he trial court chose to make specific findings regarding Mr. Selby's state of mind at various times preceding and during the fateful encounter. The court found that, at all times, Selby did not have an intent to kill Barber." Our paradox, therefore, is how to reconcile the factual finding that Petitioner lacked the intent to kill with the Circuit Court's legal conclusion, and the Court of Special Appeals's approval thereof, that Petitioner was guilty of voluntary manslaughter. We conclude that outcome is irreconcilable, for the intent to kill was a necessary element of any voluntary manslaughter conviction, and here, where the Circuit Court found it clearly lacking, Petitioner's conviction cannot stand.

## C.

■ Petitioner contends that the Court of Special Appeals erred when it appeared to conclude that the trial court's finding that Petitioner did not have an intent to kill Barber did not preclude a voluntary manslaughter conviction because an intent to commit grievous bodily harm would suffice. The Court of Special Appeals determined:

The trial court chose to make specific findings regarding Mr. Selby's state of mind at various times preceding and during the fateful encounter. The court found that, at all times, Selby did not have an intent to kill Michelle Barber. Selby argues that this finding precludes a conviction of voluntary manslaughter and, since this was a non-jury trial, it likewise renders invalid the conviction of using a handgun in the commission of a felony. We disagree.

Appellant's argument overlooks the fact that "there is a difference between the intent that will suffice to prove a consummated murder, and that which is required when death does not result." *State v. Earp*, 319 Md. 156, 163 [571 A.2d 1227] (1990). Although specific intent to kill is required to support an attempted murder conviction, an intent

to commit grievous bodily harm will support a murder or manslaughter conviction. *Earp*, at 163 [571 A.2d 1227]. (Footnote omitted.) Petitioner asserts that neither he nor the prosecution argued before the trial court that Petitioner possessed an intent to commit grievous bodily injury. Rather, the prosecution argued that Petitioner went to Barber's apartment with a premeditated intent to kill her, while Petitioner countered he never, not in route or upon arrival, intended to kill Barber. Petitioner acknowledged to the trial judge that, at most, he might have been guilty of involuntary manslaughter. Provided that the Circuit Court was not presented with evidence of intent to commit grievous bodily harm and did not make any such finding, Petitioner suggests to us that the Court of Special Appeals misinterpreted *Earp* and erred in concluding that "an intent to commit grievous bodily harm will support a murder or manslaughter conviction."

Respondent concedes that Petitioner's case did not involve an intent to commit grievous bodily harm. Instead, Respondent argues that the Court of Special Appeals merely offered *Earp*, the holding of which Respondent admits is not controlling in this case, to distinguish the various forms of homicide.[15] Because Respondent concedes *Earp* does not apply and an intent to commit grievous bodily harm is not presented on the record of Selby's case, we ordinarily would have no reason to discuss this issue further. We shall comment, however, on the intermediate appellate court's apparent misperception of our opinion in *Earp*.

In *State v. Earp*, the defendant was involved in a brouhaha involving almost 50 people who were attacking a truck that had struck a pedestrian. 319 Md. at 159–60, 571 A.2d at 1229. Defendant, unable to reach the driver of the truck, assaulted a

---

**15.** Respondent also addresses the issue of whether the Court of Special Appeals held that an intent to kill, as opposed to an intent to commit grievous bodily harm, is required to sustain a conviction for manslaughter. Respondent acknowledges that "[t]he law is clear that the crime of voluntary manslaughter is predicated upon an intentional killing." *See* Respondent's Brief, at 3. See *supra* Part III.B for our discussion of the elements of voluntary manslaughter.

man trying to protect the driver from the mob until the police arrived.[16] *Id.* Earp was convicted of attempted second degree murder and assault with the intent to maim. *Earp,* 319 Md. at 161, 571 A.2d at 1230. We were asked what were the trial court's findings concerning Earp's intent, and whether a finding of an intent to inflict grievous bodily harm, but not to kill, would satisfy a conviction of attempted murder in the second degree. *Id.* We affirmed the Court of Special Appeals's conclusion that the trial judge found that Earp possessed an intent to inflict serious bodily harm, but not an intent to murder, and thus reversed Earp's conviction, because we concluded that the specific intent to murder is a necessary element of attempted murder, and therefore an intent to commit grievous bodily harm will not suffice. *Earp,* 319 Md. at 164, 571 A.2d at 1231.

In *Earp,* we noted that intent to commit grievous bodily harm is but one of four qualifying states of minds for murder; specifically, second degree murder. *Earp,* 319 Md. at 162, 571 A.2d at 1230. We discussed this point to highlight that the *mens rea* for an attempted murder is more narrow than that for a completed murder. We did not state, however, as the Court of Special Appeals suggested, that an intent to commit grievous bodily harm will support a conviction for manslaughter. As we stated in Part III.B, *supra,* the law clearly provides that the intent to kill is a fundamental element of voluntary manslaughter. The intermediate appellate court, therefore, misapplied *Earp* in the present case.

## CONCLUSION

Manslaughter may be either voluntary or involuntary, but it cannot be both at the same time. In this case, entering a judgment of voluntary manslaughter where there is a finding of "hot blood," without a finding of intent to kill, is simply incongruous. Having concluded that the predicate felony conviction must be reversed, we also hold that the conviction

---

16. The man Earp attacked happened to be the host of the party that Earp was attending.

of the use of a handgun in the commission of that felony necessarily also is reversed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY, MARYLAND.**