792 A.2d 368

**Levone THOMAS**

v.

**STATE of Maryland.**

**No. 0255, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

March 1, 2002.

98

George E. Burns, Jr., Assistant Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Mary Ann Ince, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and Patricia Jessamy, State's Attorney for Baltimore City on the brief), Baltimore, for appellee.

Argued before HOLLANDER, EYLER, JAMES R., and SONNER, JJ.

HOLLANDER, J.

Levonne Thomas, appellant, was convicted by a jury in the Circuit Court for Baltimore City of second degree murder, as well as two counts of wearing or carrying a weapon openly with the intent to injure. The court sentenced appellant to thirty years of imprisonment for the murder conviction and three years for each weapons count, concurrent to each other but consecutive to the murder sentence. Thereafter, appellant noted this appeal and poses three questions:

I. Did the trial court err in not admitting questions involving evidence of a protective order against the victim?

II. Did the trial court err in refusing to instruct the jury on manslaughter?

III. Was appellant improperly convicted and sentenced for two counts of carrying a weapon openly with intent to injure?

We answer the first two questions in the negative but the third question in the affirmative. Accordingly, we shall reverse appellant's two convictions for wearing or carrying a weapon, but affirm the trial court's judgment in all other respects.

## FACTUAL SUMMARY

Sheila Hunter died of multiple blunt force injuries late on the night of July 21, 2000. The State's theory was that the killing was the result of an argument between the victim and appellant, her boyfriend. The State's evidence consisted primarily of pictures of the crime scene, the testimony of various police officers and the medical examiner, and appellant's statement to the police.

Appellant and the victim lived together in a second floor, one room apartment in Baltimore City. They had known each other for ten years. Shortly after midnight on July 22, 2000, in response to a 911 call, Baltimore City Police Officer Robert Peregoy knocked on appellant's door. When appellant answered, he had blood on his hands, forearms, and pants. He told the officer, "We were just fighting."

Appellant took the officer to his apartment, which was in "total disarray"; blood was observed throughout the room. The officer found the victim at the foot of the bed, with her knees on the floor, "slumped over on the bed." She had numerous bruises and wounds to her body, including a hole "almost dead center located in the back of her head." Appellant told Officer Peregoy, "She fell and bumped her head at

the table." Other officers arrived and the police recovered several items from the apartment, including two hammers near the head of the bed, one of which had blood on it; two metallic poles, one of which had blood on it; handcuffs; a serrated cheese knife; and some broken glass.

Upon arrival of an ambulance at about 12:45 a.m., the victim was pronounced dead. While at the apartment, the medics attended to appellant's injuries; they were largely "minor" and "superficial," but he had a "deep" cut to his right hand that was wrapped in gauze.

Officer Kelly Harrison transported appellant to the Homicide Division of the police station for questioning, arriving there at about 12:45 a.m. According to the officer, appellant said that "he didn't know why ... he had to go downtown and then he stated that she hit her head on a table." He added: "I wasn't there." Appellant also said, "We were playing around and she fell and she hit her head." Later, he said that the victim "was drunk."

At about 1:00 a.m., appellant was placed in an interview room at the police station. Baltimore City Police Detective Vernon Parker, who had been at the scene, arrived at the station at about 4:00 a.m. He saw that appellant had scratches on his neck, fresh bruises on his back, cuts and abrasions to his arms and hands, and that his right hand was wrapped in a bloody gauze. Although Detective Parker detected alcohol on appellant's breath, he "had no concern ... that [appellant's] judgment was clouded ... where he wouldn't understand what was going on."

Detective Parker testified that appellant provided background information and waived his *Miranda*[1] rights at around 4:30 a.m. Appellant proceeded to explain what happened. At the conclusion of the interview, appellant also provided a taped statement regarding the circumstances of the victim's death, which was admitted in evidence.

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

According to Detective Parker, appellant said that during the evening he and the victim had been drinking in their apartment and they began to argue about "different things," including "a bottle of wine that had been purchased for them to consume that evening." The detective recounted that the argument "escalated." Then, "Mr. Thomas stated that Ms. Hunter assaulted him, threw a hammer at him, and also came at him with the cheese knife...." Further, appellant said that, "during their struggles, she slipped, fell, and hit her head on the corner of the table. And then he indicated that he punched the victim in the face and in the back." Appellant thought Ms. Hunter was "playing with him," and said to her, "stop playing around." Thereafter, appellant picked up Ms. Hunter and moved her to the bed. At that time, appellant saw "a gash in her head." He also saw her stop breathing and, at that point, appellant went upstairs and told the tenant there to call the police.

In addition, a review of the transcript of the taped statement indicates that appellant said the victim was "swinging" a knife at him in connection with the wine. Appellant told her, "Here stop dam why don't you stop you already high already you gonna ... make a mistake." He then gave her the bottle of wine and she put down the knife. Then, appellant grabbed the wine bottle. In response, the victim picked up a hammer and threw it at appellant, hitting him in the back. Ms. Hunter then threw some shoes at appellant, all of which "offended" him. She also picked up the knife and started cutting appellant with it, on his left hand and thumb and over his eye. But, he said he "don't feel it...." She also cut his right hand. Further, appellant claimed that while he was holding the bottle and bleeding, Ms. Hunter came toward him with a hammer. As she swung the hammer at appellant, he said Ms. Hunter slipped and fell and hit her head on the table. Appellant then hit Ms. Hunter a few times on her back, while she lay motionless on the floor, and told her to "stop playing." Then, he picked her up and placed her on the bed.

Dr. Steven Radentz, an assistant medical examiner, performed the autopsy of Ms. Hunter. He opined that the victim

died of "[m]ultiple blunt force injuries," and had suffered a "minimum of 12 impacts." He stated that the victim suffered from a blunt force injury to her right lower back, which fractured her rib and lacerated her liver, and that the rib injury was not consistent with a fall. Rather, he said that the mark on the skin where the injury occurred was consistent with a blow from a hammer.

In addition, Dr. Radentz testified that the victim had a two-inch laceration at the back of her scalp, which was also consistent with a hammer blow. In his opinion, that injury could not have been caused by hitting a table. He also testified that Ms. Hunter had an abraded contusion on the right side of her scalp, several inches long, and contusions on her chest, which were consistent with a hammer blow. The medical examiner described several other abrasions and contusions on the left side of Ms. Hunter's face, forehead, right shoulder, and left elbow. In addition, she had puncture injuries to both breasts and the left thigh, which were consistent with the prongs of a knife, and abrasions to her back, consistent with the serrated edge of a knife.

According to the medical examiner, the victim's heart blood had an alcohol level of .17, while her peripheral blood had an alcohol level of .15 per cent. Ms. Hunter also tested positive as a cocaine user, but was not under the influence of cocaine at the time of her death.

Appellant did not present a defense case. We shall include additional facts in our discussion.

## DISCUSSION

### I.

Appellant argues that the trial court erred in failing to admit evidence involving a protective order against the victim. He contends that it "clearly supported the inference that the victim was the aggressor." We perceive no error by the trial court.

During the cross-examination of Detective Parker, defense counsel asked the detective whether he had "run a criminal record check on [the victim]." The State objected and a bench conference ensued. At the conference, relying on Maryland Rule 5–404(b), appellant's lawyer proffered that the victim had been "arrested for an assault against Levone Thomas ..." and that "there was a stay away order." Upon further questioning, the defense attorney conceded that Ms. Hunter had not been convicted, and that there was only one stay away order, issued in 1998. Defense counsel indicated that she did not plan to offer the order in the defense case, but argued that she should be permitted to cross-examine the detective about it, because "the character of the deceased is always in question when someone is charged with first-degree murder." In addition, she claimed that "enough evidence has been generated that there was self-defense in this case...."

In a lengthy discussion with defense counsel at the bench, the court carefully considered the defense argument. The following excerpts are relevant:

THE COURT: I don't understand the relevance of it. I don't know that there's a personality trait in the victim if there was one stay away order in 1998 involving these two people.

\* \* \*

There's been no evidence. I would like you to point it out to me right now because I've been listening very carefully. I have heard no evidence of self-defense. So you list it clear and distinctly, and I'm going to write down the words you use right now. Okay?

\* \* \*

[DEFENSE COUNSEL]: Yes, Your Honor. When Mr. Thomas was taken down to Baltimore City police headquarters, he told the detectives that Sheila Hunter attacked him with a knife and a hammer. It's in his statement. He also said when the detectives questioned him and they asked him, 'Did you hit her?' he says, 'Yes, I hit her.' Also, Your Honor, in the statement and through the pictures that were

generated, it corroborates Mr. Levone Thomas' statements to the police that he was cut because there were cuts on him.

The court was not persuaded. The following discussion is pertinent:

THE COURT: There is nowhere that he has testified in his statement thus far that he had any concern whatsoever about his safety at any time.

\* \* \*

In fact, as I recall the rest of the statement, he's claiming she fell off the bed or she fell and she hit her head on a table and that's how she injured herself. There is nothing so far indicating in his defense that any action of his injured her. As I've listened carefully, the only evidence of injury to her so far in his statement has been she fell and hit her head and he thought she was playing a game and, therefore, while she was not moving or doing anything and, therefore, certainly not hitting him, he socked her trying, I assume, arouse her to see if she was playing a game, but there is absolutely no testimony from him in his statement that he injured her or attempted to injure her while she was in any way hitting him. To the contrary, *his statement is she fell and hit her head on the table* and he thought she was playing, I think is what he said or something to that effect, *and therefore, he hit her. Where is the statement?* Is it in evidence?

\* \* \*

In any event, the bottom line is there is no testimony in the statement he gave to the police that he swung at her or that he injured her to cause her injuries, in the first instance, and even if—other than socking her those two times after she fell and apparently, he's claiming, hurt herself and by that time, in his testimony, she was already not moving at all. So how could he be in fear of his safety or life?

\* \* \*

*So where is the self-defense? His position is he didn't cause the injures; she fell.*

[DEFENSE COUNSEL]: Well, Your Honor, his statement to the police . . . when they asked him, 'Did you hit her?' he said, 'I hit her.' It had not been established if the hit was during, after. It's evident from the statement that when she cut him, to me that he hit her back, according to the statement, Your Honor.

THE COURT: I have the statement. Well, even if I were to look at the statement, but even if I were to accept what you just said, that in and of itself hasn't generated any self defense because *there's nothing to indicate from his point of view that any injuries he caused her were done in fear of his life or safety.*

[DEFENSE COUNSEL]: But, Your Honor, it doesn't have to . . . [S]elf-defense could be generated in the prosecution's case, Your Honor.

THE COURT: I'm not saying that, but even if you generated it in the prosecution's case, *you have to have some evidence from which reasonable people—that the jury—could find that the actions he took were done because of either reasonable, if it was perfect self-defense, fear for his life or safety, or unreasonable fear for his life or safety, if it was imperfect self-defense; and based on what you've just said, there is just no testimony in the statement he gave to the police that he hit her because he was afraid for his safety or life.* You just said it yourself.

\* \* \*

He's got to generate something and so far he hasn't generated it. . . . I don't see where he's put anything that would warrant getting in a 1998 stay away order. I'm not even sure an order could show a personality trait in and of itself in the victim and we're talking about a homicide that occurred in July of 2000. We have no idea what happened before or after that one incident in 1998. I don't think it's enough to show a trait. So I'm sustaining the State's objection.

(Emphasis added).

 The conduct of the trial "must of necessity rest largely in the control and discretion of the presiding judge,"

and an appellate court should not interfere with that judgment unless there has been error or clear abuse of discretion. *See Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707 (1974); *Simpson v. State,* 121 Md.App. 263, 283, 708 A.2d 1126 (1998). Consistent with the trial court's authority concerning the conduct of trial, "the scope of examination of witnesses at trial is a matter left largely to the discretion of the trial judge and no error will · be recognized unless there is clear abuse of discretion." *Oken v. State,* 327 Md. 628, 669, 612 A.2d 258 (1992), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *see Martin v. State,* 364 Md. 692, 698, 775 A.2d 385 (2001); *Conyers v. State,* 354 Md. 132, 176, 729 A.2d 910, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *Hopkins v. State,* 352 Md. 146, 158, 721 A.2d 231 (1998); *Blair v. State,* 130 Md.App. 571, 592–93, 747 A.2d 702 (2000).

To be sure, "a cross-examiner must be given wide latitude in attempting to establish a witness' bias or motivation to testify falsely." *Merzbacher v. State,* 346 Md. 391, 413, 697 A.2d 432 (1997); *see Martin,* 364 Md. at 698, 775 A.2d 385. Nevertheless, a "balancing test" must be employed by the trial judge, so that "questioning [is] not ... allowed to stray into collateral matters which would obscure the trial issues and lead to the factfinder's confusion." *Smallwood v. State,* 320 Md. 300, 307–308, 577 A.2d 356 (1990).

"As the decision to limit cross-examination ordinarily falls within the sound discretion of the trial court, our sole function on appellate review is to determine whether the trial judge imposed limitations upon cross-examination that inhibited the ability of the defendant to receive a fair trial." *Merzbacher,* 346 Md. at 413, 697 A.2d 432; *see Churchfield v. State,* 137 Md.App. 668, 682–84, 769 A.2d 313 (2001). Although trial courts may impose

" 'reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant[,]' ... limitation of cross-examination should not occur ... until after

the defendant has reached his ' "constitutionally required threshold level of inquiry." ' "

*Merzbacher*, 346 Md. at 413, 697 A.2d 432 (alterations in original) (internal citations omitted).

■ Under Md. Rule 5–104(a), "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court...." Generally, evidence is relevant and admissible if it tends either to establish or disprove issues in the case. *Snyder v. State*, 361 Md. 580, 591, 762 A.2d 125 (2000); *Conyers*, 354 Md. at 176, 729 A.2d 910; *Rosenberg v. State*, 129 Md.App. 221, 252, 741 A.2d 533 (1999), *cert. denied*, 358 Md. 382, 749 A.2d 173 (2000). Maryland Rule 5–401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See also Johnson v. State*, 332 Md. 456, 472 n. 7, 632 A.2d 152 (1993) ("Evidence is relevant (and/or material) when it has a tendency to prove a proposition at issue in the case").

■ Although Rule 5–402 provides that relevant evidence is generally admissible, the determination of relevancy is a matter left to the sound discretion of the trial court, and the court's rulings "may be reversed upon clear showing of an abuse of discretion." *Martin*, 364 Md. at 705, 775 A.2d 385; *see Dupree v. State*, 352 Md. 314, 324, 722 A.2d 52 (1998); *Williams v. State*, 342 Md. 724, 737, 679 A.2d 1106 (1996) (stating that "[a] trial judge's determination on relevance will not be reversed absent an abuse of discretion."); *Ebb v. State*, 341 Md. 578, 587, 671 A.2d 974, *cert. denied*, 519 U.S. 832, 117 S.Ct. 102, 136 L.Ed.2d 56 (1996); *White v. State*, 324 Md. 626, 637, 598 A.2d 187 (1991). Thus, trial courts "retain wide latitude in determining what evidence is material and relevant." *Merzbacher*, 346 Md. at 413, 697 A.2d 432; *see Corbett v. State*, 130 Md.App. 408, 426–27, 746 A.2d 954, *cert. denied*, 359 Md. 31, 753 A.2d 3 (2000). Indeed, such rulings are "quintessentially within the wide discretion of the trial judge."

*Best v. State,* 79 Md.App. 241, 259, 556 A.2d 701, *cert. denied,* 317 Md. 70, 562 A.2d 718 (1989).

With these principles in mind, we turn to explore appellant's contentions.

In *Streater v. State,* 352 Md. 800, 724 A.2d 111 (1999), the Court said that, in a harassment and stalking prosecution, evidence that the victim had obtained a prior protective order against the defendant was relevant as to the "warning element" for harassment and the defendant's "course of conduct" for stalking. *Id.* at 812–13, 724 A.2d 111. Nor was "the protective order itself, *i.e.,* without the factual findings contained therein, ... unduly prejudicial since it does no more than establish that [the defendant] had been warned not to contact or harass [the victim.]" *Id.* at 813, 724 A.2d 111. Nevertheless, because the entire protective order was admitted, which contained hearsay and factual determinations regarding other crimes that "were never assessed for their admissibility under Md. Rule 5–404(b)," *id.* at 823, 724 A.2d 111, the Court reversed the conviction.

Here, defense counsel said she did not intend to introduce the protective order. Instead, she merely wanted to establish its existence. Yet she did not actually proffer that it was Thomas who obtained the order or that it involved the victim.

We are guided by *Thomas v. State,* 301 Md. 294, 306–07, 483 A.2d 6 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985). There, the Court said that the character of the victim is admissible to corroborate evidence that the victim was the initial aggressor, but "the proponent must first establish an evidentiary foundation tending to prove that the defendant acted in self-defense." We agree with the trial court that appellant failed in this regard. We explain.

In *State v. Marr,* 362 Md. 467, 765 A.2d 645 (2001), the Court reiterated that Maryland "recognizes two varieties of self-defense—the traditional one, which [it has] sometimes termed 'perfect' or 'complete' self-defense, and a lesser form, sometimes called 'imperfect' or 'partial' self-defense." *Id.* at 472, 765 A.2d 645. *See also Roach v. State,* 358 Md. 418, 429–

32, 749 A.2d 787 (2000); *Jones v. State*, 357 Md. 408, 421–23, 745 A.2d 396 (2000); *State v. Martin*, 329 Md. 351, 357–58, 619 A.2d 992, *cert. denied*, 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993); *Dykes v. State*, 319 Md. 206, 210–12, 571 A.2d 1251 (1990); *State v. Faulkner*, 301 Md. 482, 485–87, 483 A.2d 759 (1984).

Perfect or traditional self-defense is a complete defense to a charge of criminal homicide "and, if credited by the trier of fact, results in an acquittal." *Marr*, 362 Md. at 472–73, 765 A.2d 645. The elements of that defense are:

(1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

(2) The accused must have in fact believed himself in this danger;

(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

(4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*Dykes*, 319 Md. at 211, 571 A.2d 1251; *Faulkner*, 301 Md. at 485–86, 483 A.2d 759.

Imperfect self-defense involves an "actual, subjective belief on the part of the accused that he/she is in apparent imminent danger of death or seriously bodily harm from the assailant, requiring the use of deadly force." But, either the extent of force or the perception of danger, or both, are "objectively unreasonable." *Marr*, 362 Md. at 473, 765 A.2d 645.

It is clear that imperfect self-defense "requires no more than a subjective honest belief on the part of the killer. . . ." *Faulkner*, 301 Md. at 500, 483 A.2d 759. But, if credited, imperfect self-defense does not result in an acquittal. Rather, it negates "the element of malice required for a conviction of murder and thus reduces the offense to man-

slaughter." *Marr*, 362 Md. at 474, 765 A.2d 645. As the Court explained in *Marr*, a person who commits a homicide while "honestly, though unreasonably, believing that he/she is threatened with death or serious harm and that deadly force was necessary does not act with malice, and, absent malice, cannot be convicted of murder. Nonetheless, because the killing was committed without justification or excuse, the defendant is not entitled to full exoneration and would be guilty of voluntary manslaughter." *Marr*, 362 Md. at 474, 765 A.2d 645.

In sum, "the only substantive difference between the two doctrines, other than their consequences, is that, in perfect self-defense, the defendant's belief that he was in immediate danger of death [or] serious bodily harm or that the force he used was necessary must be objectively reasonable. In all other respects, the elements of the two doctrines are the same." *Burch v. State*, 346 Md. 253, 283, 696 A.2d 443, *cert. denied*, 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997); *see Marr*, 362 Md. at 474, 765 A.2d 645; *Martin*, 329 Md. at 357–58, 619 A.2d 992.

██ The trial court correctly observed that, at the time appellant cross-examined Detective Parker regarding the protective order, the evidence had established only that appellant struck the victim *after* the victim had fallen and hit her head, allegedly in an effort to arouse her. Moreover, as the trial court noted, there was no evidence in appellant's statement, or elsewhere, that he had used force against the victim because he either objectively or subjectively believed he was in fear of imminent and serious death or bodily harm. Appellant's reference in his statement to the victim's use of a hammer and a knife does not imply that appellant was in fear of imminent and serious bodily harm. Indeed, as we noted, he denied having used force against the victim until after she fell.

The trial court also reasoned that the homicide happened in July 2000, yet there was no indication as to what occurred prior to or subsequent to the "one incident in 1998." Further, it found no support for the proposition that the protective

order was probative of a personality trait in the victim. Therefore, in connection with the issue of self-defense, we perceive neither error nor abuse of discretion by the trial court in foreclosing cross-examination of Detective Parker as to the protective order.[2]

In reaching our conclusion, we are reminded of what the Court of Appeals said in *Smallwood*, 320 Md. at 307–08, 577 A.2d 356:

> What emerges from this review of the applicable caselaw is a balancing test. A judge must allow a defendant wide latitude to cross-examine a witness as to bias or prejudices, *but the questioning must not be allowed to stray into collateral matters which would obscure the trial issues and lead to the factfinder's confusion.*

(Emphasis added) (citations omitted).

## II.

Prior to the court's instructions to the jury, appellant asked the court to give an instruction on manslaughter, perfect self-defense, and imperfect self-defense. The court noted that the only evidence generated by either party was that appellant struck the victim after she had been knocked unconscious, at a point when "she was not in any way assaulting him." Although appellant claimed the two had been fighting, the court pointed out that he did not maintain that he hit the victim "in the midst of a mutual combat." The trial court concluded that there was no foundation for a claim of legally adequate provocation or conduct in the heat of passion, and so there was nothing from which the jury "could begin to mitigate this down to voluntary manslaughter." Accordingly, viewing the evidence in the light most favorable to appellant, the court

---

**2.** We also note that the question regarding a protective order extended beyond the scope of the State's direct examination. It is well accepted in Maryland that cross-examination ordinarily may be used to explore only those areas covered by the witness in direct examination or for impeachment purposes. *Thomas v. State*, 301 Md. at 308, 483 A.2d 6. Questions about the character of the victim, whom the detective had never met, were far afield from his direct testimony.

denied the request, based on the absence of evidence that appellant was in fear for his life or that he hit the victim during "mutual combat."

As a result of that ruling, appellant now argues that the trial court erred in refusing to instruct the jury on the offense of manslaughter. He claims that the jury "could readily have found adequate provocation" for voluntary manslaughter, based upon appellant's statement to the police, introduced in the State's case, in which appellant indicated that Ms. Hunter cut him with a knife and attacked him with a hammer. Appellant has not preserved this issue for review.

After instructing the jury, the court asked the parties whether they had any exceptions to the instructions. Appellant's attorney responded, "No, Your Honor, not to the instructions." By failing to object after the court had instructed the jury, appellant failed to preserve his contention for appellate review. *See* Maryland Rule 4–325(e) ("No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly *after* the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.") (Emphasis added). *See also Conyers,* 354 Md. at 167, ·729 A.2d 910; *Burks v. State,* 96 Md.App. 173, 180–81, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993).

Even if preserved, the claim lacks merit. We explain.

Pursuant to Rule 4–325(c), a trial court "may, and at the request of any party shall instruct the jury as to the applicable law" of the case. But, a requested instruction need be given only when there is evidence in the record to support it. *Hof v. State,* 337 Md. 581, 612, 655 A.2d 370 (1995); *Martin,* 329 Md. at 357, 619 A.2d 992; *Flores v. State,* 120 Md.App. 171, 193, 706 A.2d 628 (1998). Accordingly, in deciding whether the trial court erred in failing to give the instructions, this Court must determine whether they were applicable under the facts and circumstances of the case. *See Patterson v. State,* 356 Md. 677, 683–84, 741 A.2d 1119 (1999); *Dishman*

*v. State,* 352 Md. 279, 292, 721 A.2d 699 (1998); *Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984).

 Manslaughter is defined as " 'the unlawful and felonious killing of another without malice aforethought, either express or implied, and is either voluntary or involuntary homicide, depending upon the fact whether there was an intention to kill or not.' " *Selby v. State,* 361 Md. 319, 332, 761 A.2d 335 (2000) (citations omitted). Voluntary manslaughter has been defined as,

> "an *intentional* homicide, done in a sudden heat of passion, caused by adequate provocation, before there has been a reasonable opportunity for the passion to cool."

*Id.* at 332, 761 A.2d 335 (citation omitted).

In contrast, involuntary manslaughter has been defined as an " '*unintentional* killing done without malice, by doing some unlawful act endangering life, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty.' " *Id.* (Citation omitted). As the Court in *Selby* explained, manslaughter is distinguished from murder based on the element of malice, *id.* at 331, 761 A.2d 335, and the "central element that distinguishes voluntary manslaughter from involuntary manslaughter ... is that intent to kill is an element of the former, but not of the latter." *Id.* at 332, 761 A.2d 335.

We outlined in Section I the defenses of perfect and imperfect self-defense. Therefore, we need not restate them here.

 In appellant's statement to the police, he indicated that he and the victim argued on the night of the killing, and that the victim had assaulted him with a knife and a hammer. Yet, appellant denied striking the victim in response. Rather, appellant asserted that he hit Ms. Hunter *after* she had fallen and was unconscious, and that he did so in an effort to arouse her. Significantly, appellant never expressed fear for his own safety, nor did he claim, even implicitly, that his conduct occurred in a fit of anger or resulted from provocation. It follows that the trial court properly concluded that the evi-

dence did not establish that appellant believed that the use of force was necessary to prevent imminent death or serious bodily harm to himself, or that he acted in response to legally adequate provocation. *See Sims v. State,* 319 Md. 540, 573 A.2d 1317 (1990); *Peterson v. State,* 101 Md.App. 153, 158–59, 643 A.2d 520, *cert. denied,* 336 Md. 559, 649 A.2d 602 (1994). Therefore, even if appellant had preserved his claim as to the jury instructions, the court did not err in declining to give the requested instructions.

## III.

After the State rested, appellant moved for judgment of acquittal on the charges of carrying a weapon openly with intent to injure, under Md.Code Ann. (1996 Repl.Vol.), Art. 27, § 36(a)(1). He argued that he was "a resident of that home and he had access to all of those weapons that were in the apartment. No one else was in the apartment at the time...." He also contended that "the fact that the weapons are in the private home of the defendant does not make it wear and carry to satisfy Article 27[, § ]36[.]" In response, the State conceded that appellant had not concealed the weapons on himself. But, it argued that he wore or carried them with the specific intent to injure. After discussion, the court denied the motion.

Appellant renews his claim that he was improperly convicted of two charges of carrying a weapon openly with the intent to injure. In essence, he contends that he cannot be convicted of those crimes because the two weapons—a hammer and a cheese knife—were found in his own "single room apartment," where he was a resident. Moreover, he asserts that the "mere fact that the weapons may have been used in the offense does not establish a violation of Art. 27, § 36." *See Cousins v. State,* 277 Md. 383, 397, 354 A.2d 825, *cert. denied,* 429 U.S. 1027, 97 S.Ct. 652, 50 L.Ed.2d 631 (1976) (carrying a weapon openly with intent to injure is an element "not found in the offense of assault"). He adds:

If the mere showing that some weapon was used to inflict injury or death, *e.g.* assault or murder, were sufficient proof for § 36, proof of an assault or murder without more would establish guilt of § 36. However, § 36 is a separate offense requiring proof of distinct elements; indeed, if this were not so it would "merge" with the accumulative offenses in every case.

The State counters that § 36(a) creates a single offense that may be committed in one of two ways: 1) by concealing a weapon or 2) carrying it openly with intent to injure. *See Eldridge v. State,* 329 Md. 307, 619 A.2d 531 (1993). It argues that the charge here was the intent to injure variety, and then contends that the evidence was sufficient because the items were found in the one-room apartment.

Article 27, § 36(a)(1) provides:

Every person who shall wear or carry any dirk knife, bowie knife, switchblade knife, star knife, sandclub, metal knuckles, razor, nanchaku, or any other dangerous or deadly weapon of any kind, whatsoever (penknives without switchblades and handguns, excepted) concealed upon or about his person, *and every person who shall wear or carry any such weapon,* chemical mace, pepper mace, or tear gas device *openly with the intent or purpose of injuring any person in any unlawful manner shall be guilty of a misdemeanor.*
. . .

(Emphasis added).

We reject appellant's argument that he cannot be convicted of the crime of wearing or carrying a dangerous weapon openly with the intent to injure when the wearing or carrying occurred inside his own residence. *In Re Colby H.,* 362 Md. 702, 766 A.2d 639 (2001), on which he relies, is inapposite, because it concerned the storing of a concealed, legal weapon in the home, not the offense of carrying a weapon openly with intent to injure.

In *Colby H.,* a mother who was cleaning the bedroom of her teenaged son called the police after discovering a shotgun under the mattress of her son's bed. At the time, the teen

was not home. The teenager was ultimately charged and convicted of carrying a concealed weapon, in violation of § 36(a)(1), but the Court of Appeals reversed. It determined that the teenager did not violate the concealed weapon portion of the statute by storing a legal weapon in his own home. *Id.* at 709, 766 A.2d 639. Writing for the Court, Judge Cathell reasoned that, "generally, a person in legal possession of a dangerous and deadly weapon may conceal or store it as long as they are on property, which they own, or are a legal resident of, or are an invited quest who has informed the owner or resident of the presence of the weapon." *In re Colby H.*, 362 Md. at 723, 766 A.2d 639.

In reaching its conclusion, the Court considered an evaluation of Art. 27, § 36B, involving handguns, as "instrumental" to an understanding of § 36(a). *Id.* at 719, 766 A.2d 639. Indeed, it said that § 36 is a "counterpart" to § 36B, and "serves almost as an extension of the same legislative policy." *Id.* at 720, 766 A.2d 639. As the Court noted, " '[t]he proscribed conduct' " in both statutes " 'is the carrying of the designated weapon.' " *Id.* at 720, 766 A.2d 639 (quoting *Eldridge*, 329 Md. at 313, 619 A.2d 531).

Upon review of the language and legislative history of Art. 27, § 36B, the Court said that it constituted an attempt by the Legislature to reduce and prevent crimes of violence. *Id.* at 718, 766 A.2d 639. Thus, it proscribes wearing, transporting, or carrying of a handgun, regardless of whether it is carried openly or concealed. *Id.* Yet, despite the Legislature's "toughened stance on handguns on the street and in public areas . . . .," *id.* at 719, 766 A.2d 639, the Court found it significant that the Legislature included an exception for possession of a legal handgun in the home.

In the court's view, "[t]he Legislature wanted what was implied in the more lenient section 36 to be specifically expressed in the stricter section 36B." *Id.* at 719, 766 A.2d 639. Therefore, based on the "private property exception," the Court recognized that "a person has a right to possess a legal firearm in the home." *Id.* Accordingly, because the teen had

concealed a weapon within his own home, his conduct did not violate § 36. As the Court said, a contrary interpretation "would restrict the manner in which one could carry a legal weapon from room to room within one's home and would inhibit an act that is so intrinsic to ownership and self-defense that it would unreasonably interfere with the exercise of one's constitutional right to *possess* the [deadly weapon]."

*In re Colby H.*, 362 Md. at 721, 766 A.2d 639 (quoting *State v. Stevens*, 113 Or.App. 429, 432, 833 P.2d 318, 319 (1992)).

In contrast to *In Re Colby H.*, appellant was not accused of concealing the weapons in his home. Rather, the State claimed that he openly carried them with the intent to injure, and the jurors were instructed to that effect. We do not read *Colby H.* as sanctioning the carrying of a legal weapon in one's own home, when it is done openly and with the intent to injure. Indeed, many acts are proscribed even in the sanctity of one's own home. Although there are certain exceptions, one ordinarily cannot intentionally injure another with a legal weapon, merely because the event occurs in the privacy of the home. In much the same way, we do not believe that Art. 27, § 36 permits a person to carry a weapon openly, when done with the intent to injure, even if such conduct occurs in one's residence.

 Nevertheless, we agree with appellant that the evidence was insufficient to establish the offenses. We explain.

 Evidence is sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)(emphasis in original); *see Dawson v. State*, 329 Md. 275, 281, 619 A.2d 111 (1993). The limited question before an appellate court "is not whether the evidence *should have or probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder." *Fraidin v. State*, 85 Md.App. 231, 241, 583 A.2d 1065,

*cert. denied,* 322 Md. 614, 589 A.2d 57 (1991) (emphasis in original). Nor is it the function of the appellate court to determine the credibility of witnesses or the weight of the evidence. *Jones v. State,* 343 Md. 448, 465, 682 A.2d 248 (1996). Rather, it is the jury's task to resolve any conflicts in the evidence and assess the credibility of witnesses. State v. *Albrecht,* 336 Md. 475, 478, 649 A.2d 336 (1994).

In this case, the court instructed the jury, *inter alia,* that, in order to convict appellant of wearing or carrying certain weapons openly with the intent to injure, the State had to prove that the defendant wore or carried a dangerous weapon, and that it was carried openly with the intent to injure. The court also defined a dangerous weapon. Then, in discussing the weapons charges in its closing argument, the State said, in its entirety: "As to the deadly weapon charges, the defendant has to be in possession of those weapons and he has to use them against the victim." In response, the defense attorney argued, in part, that the State had to prove that appellant "wore it, he carried it openly, and that he had the intent to injure...."

In essence, the State's argument here is to the effect that the mere use of the weapons necessarily established that they were carried openly with the intent to injure. Little more has been identified by the State to support the convictions. In its brief, the State asserts that "the evidence established that the hammer and cheese knife were located in Thomas's apartment in close proximity to the victim, and were consistent with having been used to inflict certain of the multiple wounds inflicted upon the victim...."

Although *Colby H.,* 362 Md. 702, 766 A.2d 639, is distinguishable from this case, its discussion of sufficiency of evidence as to a concealed weapon charge is useful. The Court considered whether the evidence was sufficient to establish the offense of wearing or carrying a dangerous weapon, "where the prosecution proves nothing more than [that] the police found a shotgun under a mattress in [the teen's] room ... when [he] was not even home." *Id.* at 705, 766 A.2d 639. It

concluding that the evidence was insufficient, the Court observed that there "was absolutely no . . . evidence regarding the status of the shotgun from the time it was purchased to the time it was discovered. . . ." *Id.* at 708, 766 A.2d 639. Because the record did not show how or when the teen purchased or obtained the weapon or transported it, the Court was of the view that it could not infer that the teen had concealed the weapon while in public. *Id.* at 709, 766 A.2d 639. It added that the State had "merely proven that there was a weapon under" the mattress, which had been purchased by the respondent. *Id.* at 714, 766 A.2d 639. Yet the State did not present any evidence as to "the circumstances surrounding the placement of the weapon beneath the mattress. . . ." *Id.*

In order to establish the offenses in issue, we believe the State was required to prove more than mere use of the weapons by appellant or recovery of them in his one-room residence, in the vicinity of the victim. If we were to adopt the State's position, it would mean that almost any time a person commits an offense with a dangerous weapon, he or she could also be convicted of having carried the weapon openly, with intent to injure.

**JUDGMENTS OF CONVICTION REVERSED AS TO TWO COUNTS OF WEARING OR CARRYING A WEAPON OPENLY WITH THE INTENT TO INJURE. JUDGMENTS AFFIRMED IN ALL OTHER RESPECTS. COSTS TO BE PAID ONE HALF BY THE MAYOR AND CITY COUNCIL OF BALTIMORE AND ONE–HALF BY APPELLANT.**