991 A.2d 100

Jose Luis **RODRIGUEZ**

v.

**STATE of Maryland.**

**No. 2852, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

March 24, 2010.

Anne K. Olesen, on the brief, Washington, DC, for appellant.

Michelle W. Cole (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

**202**

Panel: SALLY D. ADKINS, * WOODWARD, WRIGHT, JJ.

WOODWARD, J.

Jose Luis Rodriguez, appellant, was arrested on June 25, 2006, in connection with two burglaries of Fratelli's Restaurant in Salisbury, Maryland. On December 7, 2006, a jury trial was held in the Circuit Court for Wicomico County, Maryland, before Judge Donald C. Davis. The jury found appellant guilty of two counts each of burglary in the second degree, burglary in the fourth degree, and theft over $500, and one count of wearing, carrying or transporting a handgun in a vehicle on public roads. The judge sentenced appellant to an aggregate sentence of 33 years in prison, with all but 17 years suspended, and five years probation. Appellant was also ordered to pay restitution to the owners of the restaurant.

On appeal, appellant presents four issues [1] for our review, which we have condensed into two questions:

I. Did the trial court err in denying the motion to suppress appellant's statement to police?

II. Did the trial court err or abuse its discretion in limiting appellant's examination of two witnesses?

---

* Sally D. Adkins, now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; she participated in the adoption of this opinion as a specially assigned member of this Court.

1. Appellant's issues, in the words of his brief, are:

1. Whether the trial court erred by admitting the statements [appellant] made in response to Officer Donoway's explicit questioning in the absence of *Miranda* warnings.

2. Whether [appellant]'s mental impairment rendered the incriminating statements he made in response to Officer Donoway's questioning involuntary.

3. Whether the trial court erred by refusing to allow [appellant] the right to present a full defense by limiting his cross-examination of the complaining witness regarding an alternative suspect the witness had implicated.

4. Whether the trial court erred by refusing to allow [appellant] the right to present a full defense by questioning Jose Luis Gonzales Ruperto before the jury about Ruperto's involvement in the burglaries.

For the following reasons, we shall affirm the judgments of the circuit court.

## BACKGROUND

In June 2006, Fratelli's Restaurant was burglarized twice. The first burglary occurred early in the morning on June 23, 2006. At approximately 2 a.m., Sergeant Brian Waller of the Salisbury University Police Department reported to the restaurant in response to a security alarm, but did not see anything when he arrived. Nicholas Sakellis, one of the owners of Fratelli's Restaurant, testified that he discovered the restaurant had been burglarized when he arrived at about 9 a.m. He testified that he found the restaurant's side-door locked, an office window broken, a crowbar on the desk in the restaurant's office, and a Fratelli's bank bag missing. According to Sakellis, the missing bank bag contained seven or eight thousand dollars. He testified that nothing else was taken from the restaurant. Eugene Peed, a Salisbury University employee, testified that he saw a dark-colored Honda parked in the back of Fratelli's early in the morning on June 23, 2006.

In the early morning hours of June 25, 2006, Fratelli's was burglarized again. Sergeant Waller responded again, along with Officer Kelly Craven of the Salisbury University Police Department. Sergeant Waller testified that they saw a red Oldsmobile Alero parked in the restaurant's parking lot, and it was warm to the touch. He stated that Officer Craven informed him that the car had not been there when she patrolled the area earlier that morning.

Both Sergeant Waller and Officer Craven testified that, when they went to inspect Fratelli's, a man ran out of the restaurant and fled. Sergeant Waller chased him on foot, as did Sergeant Anthony Glenn, another police officer who responded to the scene of the burglary. Sergeant Waller and Officer Glenn lost sight of the suspect, searched the Salisbury University campus for forty-five minutes, but did not locate the man.

Sergeant Waller testified that he momentarily got a view of the man's side profile, and for the most part, only saw the man's back or his "back side at an angle." He described the man as six feet tall, slenderly built, light-skinned black or dark-skinned white, and wearing a light colored ball cap and a white t-shirt.

At about 8:30 a.m., on June 25, appellant was arrested in the Fratelli's parking lot when he arrived in a dark-colored Honda Accord with Corey Clark, Jessica Murphy, and Jose Luis Gonzales Ruperto. Appellant was driving the Honda toward the Alero, which was owned by Clark. Several officers testified that Ruperto was acting "antsy," "nervous, [and] kind of flighty" as he moved "all over the back of the [Honda]" and reached down "underneath the driver's seat." Appellant was described as being out of it, going "in and out of being asleep and awake" while seated in the car. Sergeant Waller testified that at one point, appellant was "laid over the steering wheel making a sound that sounded to me like he was snoring with his eyes shut and drool." Comparing appellant and Ruperto with the suspect he had chased hours before, Sergeant Waller testified that, although Ruperto was a little taller, he could not exclude either of them.

During a search of the Honda, officers found a handgun under the driver's seat and tools that matched the color and brand of the crowbar that was left at Fratelli's following the first burglary. The Alero was also searched; in the glove compartment officers found appellant's wallet containing his Maryland driver's license, social security card, and $810 in cash.

Officer Bobbie Jo Donoway drove appellant to the Sheriff's Office following his arrest. Officer Donoway testified that, during the transport, Mr. Rodriguez went "from one extreme to the other;" he was "completely enraged" one moment and then "fall[ing] asleep" the next. According to Officer Donoway, appellant's "eyes were extremely red, and he was very upset." Officer Donoway testified that she asked him a series of questions in an effort "[t]o calm him down and to make sure

that he was, in fact, okay." She testified that, at one point appellant said: "I can't keep doing this, I'm already in trouble, I'm going to jail, I did it."

At appellant's trial, on December 7, 2006, Clark and Murphy testified for the State. Clark stated that she had known appellant for a couple months, and they had spent a lot of time together. In the beginning her relationship with appellant was "sexual," but then they were "just friends." Clark testified that she would use heroin and crack cocaine with appellant. Clark stated that on the evening of June 24, she and appellant were at "[s]ome house over on the west side" with Murphy, Ruperto, and a Puerto Rican man. According to Clark, she, Murphy, appellant, and Ruperto were all "getting high" over the course of the next 12 hours. Clark testified that appellant left the house around 3 a.m. on June 25 and returned a couple hours later without her car. Clark also testified that she remained in one room the entire night with Murphy and Ruperto, and was "awake that whole time." Clark also testified that a few days before June 25, she saw a bank bag in appellant's car and appellant "all of a sudden" was in possession of a large sum of money that he kept in stacks folded in a towel in his closet.

Murphy testified that on the evening of June 24, she, Clark, appellant, Ruperto, and some other men were at a house on the west-side. Murphy admitted that she, Clark, appellant and Ruperto were doing drugs and engaging in sexual activities. Murphy stated that appellant left the house sometime in the early morning for "maybe an hour and 45 minutes." She only learned that appellant had left when she noticed that Clark's car was not outside the house. Murphy testified, as did Clark, that later in the morning of June 25, appellant drove her, Clark, and Ruperto to Fratelli's restaurant to pick up Clark's car.

Appellant testified in his own defense. According to appellant, on the evening of June 24, 2006, he and Ruperto rode in appellant's Honda to meet Clark and Murphy in the parking lot of Fratelli's Restaurant. Appellant testified that Clark and

Murphy were in Clark's Alero, and the four agreed to leave the Alero at Fratelli's so that they could ride in one car to buy drugs for the night. Appellant testified that they then drove to a house "just to have sex and use some drugs." Appellant testified that the four left the house in his Honda and returned to Fratelli's parking lot to pick up Clark's car. Finally, appellant stated that the cash in his wallet was part of the $2000 that his parents had sent him to rent an apartment.

The defense also called Ruperto to testify. Outside the presence of the jury, Ruperto invoked his Fifth Amendment privilege against self-incrimination when asked about the burglaries. With the jury present, Ruperto was questioned about the gun found under the driver's seat of appellant's Honda and invoked his Fifth Amendment privilege.

Following Ruperto's testimony, Deputy Mark Walker took the stand. Deputy Walker testified that Ruperto admitted to him that the gun was his. Deputy Walker explained that, after Ruperto testified at appellant's trial, Ruperto was taken to the holding area. At some time thereafter, Ruperto started beating on the holding cell door. Deputy Walker asked him if there was something wrong. Ruperto responded, in broken English, "gun mine, charges mine, he's innocent."

At the conclusion of trial on December 7, 2006, the jury returned a verdict, finding appellant guilty of two counts of burglary in the second degree, two counts of burglary in the fourth degree, and two counts of theft over $500, and one count of wearing, carrying or transporting a handgun in a vehicle on public roads. The judge sentenced appellant to 15 years' in prison with all but seven years suspended on one count of second degree burglary, to a consecutive 15 years' imprisonment with all but seven years suspended on the other count of second degree burglary, and to a consecutive three years' incarceration on the hand gun charge. Appellant was placed on five years' probation upon release from incarceration. The remaining convictions merged for sentencing purposes. Appellant was also ordered to pay restitution to the

owners of Fratelli's Restaurant. On December 26, 2006, appellant timely noted this appeal.

We will set forth additional facts and proceedings below as necessary to discuss the questions presented.

## *DISCUSSION*

### I.

### Motions Hearing

On December 1, 2006, at a motions hearing, the defense sought to suppress statements made by appellant to Officer Donoway while appellant was being transported to the Sheriff's Office in her patrol vehicle following his arrest. The defense moved to exclude appellant's statements, arguing that his statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and additionally were not voluntarily given.

Officer Donoway was the only witness who testified at the suppression hearing. Her testimony is set forth in its entirety:

[PROSECUTOR]: State[ ] your name and agency.

[WITNESS]: Deputy [ ] Donoway with the Wicomico County Sheriff's Office, currently assigned to the SRO Division.

[PROSECUTOR]: On June 25th of 2006 at approximately 9:46 a.m., were you working at the Sheriff's Office?

[WITNESS]: Yes, I was.

[PROSECUTOR]: What was your assignment at that time?

[WITNESS]: I was actually assigned to the airport duty when I was called to a different location to transport a subject for detectives at our agency.

[PROSECUTOR]: What location were you called to?

[WITNESS]: 306 South Salisbury Boulevard.

[PROSECUTOR]: Is that Fratelli's Restaurant?

[WITNESS]: Yes, it is, yes.

[PROSECUTOR]: When you went to that location, did you make contact with someone?

[WITNESS]: I did. I made contact with First Sergeant Tim Robinson who advised me that I needed to transport a subject for the detectives to the Sheriff's Office.

[PROSECUTOR]: Had you had any involvement in the investigation of that case?

[WITNESS]: I did not. I [was] working the airport prior to the transport.

[PROSECUTOR]: Did you have any involvement in the investigation after the transport?

[WITNESS]: No, I didn't.

[PROSECUTOR]: Who was the subject that Sergeant Robinson asked you to transport?

[WITNESS]: He didn't actually advise me of the subject's name prior to the transport. I found out later that it was Jose Luis Rodriguez.

[PROSECUTOR]: Do you see that person in the courtroom?

[WITNESS]: Yes, sitting at the defense table.

[PROSECUTOR]: And the record reflect she identified [appellant]. Were you in a marked police car?

[WITNESS]: Yes, I was.

[PROSECUTOR]: Where did you place [appellant]?

[WITNESS]: In the front seat passenger's side.

[PROSECUTOR]: Was he in handcuffs?

[WITNESS]: Yes, he was.

[PROSECUTOR]: Do you have any information regarding whether he was advised of his Miranda rights prior to transport?

[WITNESS]: I do not.

[PROSECUTOR]: Did you advise him of Miranda rights before transport[?]

[WITNESS]: I did not. I did not place him under arrest.

[PROSECUTOR]: During the transport, were you intending to interrogate him for investigative purposes?

[WITNESS]: No, I was [not].

[PROSECUTOR]: Describe what happened during the transport, please.

[WITNESS]: Actually, the other officers placed him in my patrol vehicle. When we were in route back [appellant] became very angry and upset using profanity. He was enraged that he was being taken into custody. He went from moments of complete outrage[ ] to that he seemed like he was going to pass out. I kept asking [appellant], are you okay? He was mumbling things. Sometimes he used profanity and I couldn't understand him.

**One of the things he said to me was I can't do this anymore, I have to stop this. [Appellant] then slumped down into the seat and his eyes were extremely red, and I was concerned that something was wrong with him. So I asked him, again, are you okay?**

**[Appellant] replied, yes. I asked [appellant]—what [ ] lead to this was that he was upset. He said that he didn't do anything, that he was going to go to jail. And I asked [appellant], I said, have you been arrested before because, you know, that's something to consider if you haven't been arrested before. I don't know why you are so upset.**

**He had made the comment, yes, for taking a car. I can't keep doing this. I'm already in trouble. I'm going to jail. I did it.**

After that, I placed [appellant] into a cell at the Sheriff's Department and I let detectives know that he was there, and he was fine, and I let them know some of the comments that he had made because I wasn't familiar with [appellant] or anything that was going on at Fratelli's, but obviously, he was upset about something.

[PROSECUTOR]: What was your purpose in speaking to [appellant] during the transport?

[WITNESS]: I was concerned. Like I said, he went from moments of outrage to anger where I was trying to calm him down during the transport to where he acted like he was going to pass out. So I didn't know if he was okay. If I needed to take him to the hospital. So I wanted the detectives to also know that he went from one extreme to the other, you know, in case there was an episode with them when they actually came back and spoke to him.

[PROSECUTOR]: What was your purpose in asking, have you been arrested before?

[WITNESS]: I was trying to calm the subject down. Obviously, he did not want to go to jail. I was trying to make him feel better. If he didn't have a record, you know, maybe things would work out better for him.

[PROSECUTOR]: Was your purpose in speaking to [appellant] to obtain incriminating information, statements from him?

[WITNESS]: No, it was not.

[PROSECUTOR]: Did he appear to you to be under the influence of drugs or alcohol?

[WITNESS]: I'm not sure if he was under the influence of drugs or alcohol or if he was suffering from sleep deprivation. I'm not sure. He was not acting in his right mind, no.

[PROSECUTOR]: Did you make any threats to [appellant] before, during transport?

[WITNESS]: No, I did not.

[PROSECUTOR]: Did you make any promises to him to get him to speak to you?

[WITNESS]: No, I did not.

[PROSECUTOR]: Apply any coercion to him whatsoever?

[WITNESS]: No, I did not.

[PROSECUTOR]: Thank you.

Your witness.

CROSS–EXAMINATION

[DEFENSE COUNSEL]: You indicated, and these are my words, you indicated that he was out of it. Is that a fair characterization of what was [going] on?

[WITNESS]: Yes.

[DEFENSE COUNSEL]: And he was coming back into the ability to converse with you and then he didn't have the ability to converse with you, is that correct?

[WITNESS]: He went from using profanity and cussing me out and every single law enforcement officer out that was at the scene to not talking and acting like he was going to go to sleep. Those are the two extremes that he was going back and forth from.

[DEFENSE COUNSEL]: The particular statement that I'm concerned about is the statement where at the end of the statement is, I did it. That was a statement that he made immediately following your question, have you ever been arrested before, is that correct?

[WITNESS]: Actually, he made other comments before he said, I did it.

[DEFENSE COUNSEL]: I understand that, but the question that you offered to him most recent in time prior to him saying I did it was have you ever been arrested before, is that correct?

[WITNESS]: To the best of my knowledge, yes.

[DEFENSE COUNSEL]: And when you asked him have you ever been arrested before, he answered the question that he had?

[WITNESS]: He didn't say, yes, I had. He said, I keep doing this. I'm already in trouble. I'm going to jail. I did it. He did not say he had actually been in jail, no.

[DEFENSE COUNSEL]: Did you record that statement in some way in terms of notes or—

[WITNESS]: Yes. Actually when I came back to the Sheriff's Department, I spoke to the detectives, and they asked me to write a supplement in which I did.

[DEFENSE COUNSEL]: Okay.

The questions, are you okay, were those questions that were out to [appellant] before, after, or both before and after the point in time that you asked the question, have you ever been arrested?

[WITNESS]: **During the entire transport, I kept asking him if he was okay.**

[DEFENSE COUNSEL]: **So you asked him that question after you asked him, have you ever been arrested?**

[WITNESS]: **Yes. I asked him if he was okay when I placed him in the cell.**

[DEFENSE COUNSEL]: Okay.

How many times did you ask him that question?

[WITNESS]: I can't recall.

[DEFENSE COUNSEL]: The extent of your interaction with [appellant] lasted just during the period of time of transport in the car?

[WITNESS]: Yes, sir.

[DEFENSE COUNSEL]: Then you placed him in a cell?

[WITNESS]: Yes, sir.

[DEFENSE COUNSEL]: Any other law enforcement officers in the car during the time of transport?

[WITNESS]: No, sir.

[DEFENSE COUNSEL]: I don't have any further questions of this witness, Your Honor.

(Emphasis added).

In denying defense counsel's motion to suppress, the trial court stated:

Well, here, I agree with [defense counsel] at least in part. There, obviously, is no question that [appellant] was in custody at the time of these particular statements, and it's clear also that there was interrogation in the sense that there was a question asked.

But, and in the sense that any question, I guess, could be by definition an interrogation, but within the context here, interrogation refers to either expressed questioning or its functional equivalent or anything else, any other actions or

words on the part of law enforcement that the police should know are reasonably likely to elicit an incriminating response from a defendant.

In this particular case because [appellant] was acting in what the officer determined to be an—I will describe it—as a strange way, having personality swings from being enraged and cursing to then seeming to go to sleep or perhaps be on the threshold of passing out, she asked the defendant on several occasion[s] if he was all right, and at least a number of those occasions would indicate, would respond not necessarily, as I understand it with saying he was all right, but rather talking about his situation that he can't do this anymore, things of that sort, and there came a time when in what the officer determined to be a, would be perhaps a question that might permit her to calm [appellant] down asked if he had been arrested before. And if that's obviously a question.

Is it a question that either this officer or a reasonable officer would ha[ve] reason to believe or know was reasonably likely to elicit an incriminating response? Well, if saying, Yes, I have been arrested, I have been arrested before would be incriminating, then certainly it's interrogation within the meaning of these rules.

**But whether or not he has been arrested before, it would seem to me is irrelevant to and is certainly not inculpatory so far as this particular case is concerned because what is inculpatory here relates to the circumstances and facts of this case, not some other case which may have—for which he may have been arrested.**

**And for [appellant] to respond to that, yes, I did it, I'm going to jail referring to this case is not a response that I think a reasonable officer or this officer would have occasion to reasonably expect,** so whether or not he had been given Miranda warnings, I think, is immaterial with respect to the question of whether or not there was interrogation within the Supreme Court and Maryland decisions relating to interrogation without the benefit of Miranda.

As to whether or not the statement was voluntary, of course, that decision is made based on the totality of the circumstances.

It is the State's burden of proof to establish beyond a reasonable doubt, but I think it's perhaps—there is Judge Moylan indicated that **when the issue is voluntariness, the failure of the defendant to testify almost forecloses any chance of prevailing.**

And under the officer['s] testimony, clearly, she considered [appellant] to be acting in a strange way because of mood swings and was concerned enough with that, that she asked him on a number of occasions if he was all right.

On the other hand, **it's obvious that she was satisfied with his responses to that extent,** because at least from the evidence, **she took him on to the Sheriff's Department or to the Detention Center, placed him in lockup there rather than taking him to the hospital** which she made those inquiries, she said, to determine whether or not she should divert to the hospital.

**No evidence of threats, promises, coercion and anything else, and based on the totality of the circumstances, I'm satisfied that the statement was voluntary as well, so I will deny the motion.**

(Emphasis added).

## A.

### Standard of Review

■■■ When reviewing a circuit court's disposition of a motion to suppress evidence, we "consider only the facts and information contained in the record of the suppression hearing." *Longshore v. State,* 399 Md. 486, 498, 924 A.2d 1129 (2007). " '[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion,' " in this case, the State. *Owens v. State,* 399 Md. 388, 403, 924 A.2d 1072 (2007) (quoting *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003)). We defer to the trial court's factual findings and

uphold them unless they are shown to be clearly erroneous. *Owens*, 399 Md. at 403, 924 A.2d 1072. We also make our "'own independent constitutional appraisal,'" by reviewing the relevant law and applying it to the facts and circumstances of this particular case. *Longshore*, 399 Md. at 499, 924 A.2d 1129 (quoting *Jones v. State*, 343 Md. 448, 457, 682 A.2d 248 (1996)).

## B.

### Miranda

Appellant first argues that the trial court erred by not granting defense counsel's motion to suppress the statements Officer Donoway obtained from appellant. Specifically, appellant contends that Officer Donoway's questioning of appellant constituted custodial interrogation and was not subject to an exception from *Miranda* for questions relating to routine booking or public safety, "as it did not occur during routine booking and was not justified by an emergency." Further, appellant argues that Officer Donoway's questions were the functional equivalent of custodial interrogation, because she should have known that her questions were likely to elicit an incriminating statement from appellant.

Finally, appellant contends that the trial court improperly interpreted *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), when it based its decision "on whether a direct response to the question 'Have you ever been arrested before?' would be incriminating." The proper inquiry under *Innis*, appellant asserts, was "whether, under the totality of the circumstances, Officer Donoway's *questions* were reasonably likely to elicit an incriminating response, not whether a *direct response* to her questions would have been incriminating." (Emphasis in original). According to appellant, a correct application of *Innis* would have led the court to the conclusion that, "[g]iven [appellant's] impaired mental condition, his emotional volatility, and his demonstrated tendency to ramble in response to the officer's initial questions, Officer Donoway should have known that continued question-

ing was likely to elicit an incriminating response." We disagree and explain.

In *Miranda*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 86 S.Ct. 1602. Custodial interrogation refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* When a suspect is in custody, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* A person may waive the effectuation of his or her *Miranda* rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.*

It is well established that *Miranda* warnings are not required in the absence of interrogation. *Innis,* 446 U.S. at 300, 100 S.Ct. 1682 ("It is clear therefore that the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."); *see also Ashford v. State,* 147 Md.App. 1, 37, 807 A.2d 732 (2002). In *Innis,* the Supreme Court stated that

the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

446 U.S. at 301, 100 S.Ct. 1682 (footnote omitted). In other words, custodial interrogation involves "either express questioning or its functional equivalent." *Id.* at 300–01, 100 S.Ct. 1682.

Appellant's initial argument focuses on the phrase "express questioning" in *Innis*. Appellant puts forth a two-part analysis. First, appellant contends that Officer Donoway's questioning of appellant constituted "express questioning," because she directly questioned appellant when appellant was in custody. Second, appellant argues that the only exceptions to the "express questioning" test of *Innis* are where the officer's questions relate to routine booking or public safety. Appellant, in effect, contends that any question posed by a law enforcement officer to a suspect in custody, other than a question relating to routine booking or public safety, constitutes "express questioning," under *Innis* and thus is violative of *Miranda*.

The legal basis for appellant's argument was rejected by the Court of Appeals in the recent case of *Prioleau v. State*, 411 Md. 629, 984 A.2d 851 (2009). In *Prioleau*, undercover detectives observed the petitioner enter a home at 1610 Regester Street, emerge with a bag of suspected cocaine, and hand the bag to Keith Evans, who strolled back and forth on Regester Street engaging in "hand to hand transactions" with individuals who approached. *Id.* at 633, 984 A.2d 851. The police then arrested Evans and escorted him into the house at 1610 Regester Street, where numerous torn clear plastic bags were found on the floor, indicating drug activity in the house. *Id.* at 634, 984 A.2d 851. The petitioner was also arrested, driven to 1610 Regester Street, and was walked up to the entrance of the house by the arresting officer. *Id.* When the petitioner reached the front door, a detective was standing there. *Id.* The detective said to the petitioner: "What's up, Maurice?" *Id.* The petitioner then said: "I'm not going in that house. I've never been in that house." *Id.*

The Court of Appeals held that the above statements by the petitioner were not the product of either actual interrogation or its functional equivalent. *Id.* at 639, 984 A.2d 851. The Court began its analysis by observing that

it is clear that (1) Petitioner was "in custody" when he made the inculpatory statement, and (2) none of the exceptions to the requirements of *Miranda v. Arizona* are applicable.

Petitioner was therefore entitled to suppression of the statement at issue if that statement resulted from either **actual** interrogation or the **functional equivalent** of interrogation. *Prioleau,* 411 Md. at 638–39, 984 A.2d 851 (emphasis in original) (footnotes omitted).

In addressing the issue of whether "What's up, Maurice?" constituted "actual interrogation," the Court stated that "it is very well settled that not every question constitutes 'interrogation' of a suspect who is in custody when the question is asked." *Id.* at 639, 984 A.2d 851. The Court quoted with approval the case of *Johnson v. State,* 269 Ind. 370, 380 N.E.2d 1236, 1240 (1978), wherein the Supreme Court of Indiana stated:

> "The term 'interrogation' has been defined as a process of questioning by law enforcement officials which lends itself to obtaining incriminating statements. Not every statement uttered by a police officer which is punctuated with a question mark will necessarily constitute an interrogation. . . . Rather, it is necessary to view the statement in the context in which it was made."

*Prioleau,* 411 Md. at 639, 984 A.2d 851 (citation omitted) (alteration in original).

The Court of Appeals went on to articulate the type of questions that constitute "actual interrogation" as those "directed to the issue of whether a suspect who is in custody has engaged in and/or has knowledge of criminal activity." *Id.* Finally, the Court cited to its opinion in *Hughes v. State,* 346 Md. 80, 95–96, 695 A.2d 132 (1997), for the principle that " 'the critical inquiry is whether the police officer, based on the totality of the circumstances, knew or should have known that the question was reasonably likely to elicit an incriminating response.' " *Prioleau,* 411 Md. at 643, 984 A.2d 851. The Court concluded that the question "What's up, Maurice?" did not constitute actual or express interrogation contemplated by *Miranda. Id.* at 643, 645–46, 984 A.2d 851.

In *Smith v. State,* 186 Md.App. 498, 974 A.2d 991, *cert. granted,* 410 Md. 702, 980 A.2d 482 (2009), Judge Charles

Moylan, Jr. reached a similar conclusion in his scholarly synthesis of *Miranda* procedures and *Miranda* applicability rules. Judge Moylan wrote:

### What Precisely is *Miranda* Interrogation?

**In its simplest form, interrogation is an easy concept to grasp. It is a police officer asking a question of a suspect about the suspect's involvement in a crime.** At the edges, however, the concept can get a little blurry. It is not always an orchestrated set of alternating questions and answers. Every actual question, moreover, is not necessarily followed by a question mark. It has been the more shadowy concept of the functional equivalent of interrogation that *Miranda* has had to come to grips with in terms of its applicability.

*Id.* at 540–41, 974 A.2d 991.

Therefore, "express questioning" under *Innis* refers to the commonly understood concept of interrogation, namely, a law enforcement officer asking a question of a suspect in custody about the suspect's involvement in a crime or where, under the totality of the circumstances, the officer knew or should have known that the question was reasonably likely to elicit an incriminating response.[2]

In the case *sub judice*, none of Officer Donoway's questions asked appellant about his involvement in a crime. Officer Donoway's repeated questions, "are you okay?," sought information about appellant's physical well-being. Officer Donoway's somewhat garbled question, "I asked [appellant]—what lead to this was that he was upset," was not an inquiry into appellant's involvement in a crime. Finally, the key question of "have you ever been arrested before," was directed toward appellant's prior contact with the criminal justice system and not with appellant's involvement in an earlier crime.

---

**2.** An incriminating response is one "whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Rhode Island v. Innis*, 446 U.S. 291, 301 n. 5, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (emphasis in original).

Nevertheless, appellant argues that Officer Donoway's questioning "was still interrogation because Officer Donoway should have known that her questions were likely to elicit an incriminating response from [appellant]." We disagree.

In *Hughes*, the Court of Appeals stated that the "[a]ssessment of the likelihood that an otherwise routine question will evoke an incriminating response requires consideration of the totality of the circumstances in each case, with consideration given to the context in which the question is asked." 346 Md. at 95, 695 A.2d 132. The intent of the police may be helpful in the analysis, but it is not dispositive. *See State v. Conover,* 312 Md. 33, 44 n. 6, 537 A.2d 1167 (1988); *Innis,* 446 U.S. at 301 n. 7, 100 S.Ct. 1682 ("This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response."). The police, however, "cannot be held accountable for the unforeseen results of their words or actions." *Innis,* 446 U.S. at 302, 100 S.Ct. 1682.

Here, the question that produced appellant's incriminating response was "have you ever been arrested before." Appellant asks us to inquire, "whether, under the totality of the circumstances, Officer Donoway's *questions* were reasonably likely to elicit an incriminating response, not whether a *direct response* to her question[ ] would have been incriminating." The problem with this contention is that at the motions hearing defense counsel argued only that "an objective officer under the circumstances might expect that *a question* dealing with [appellant's] prior criminal behavior ... might elicit an incriminating response." (Emphasis added). Defense counsel did not claim that any other question, alone or in combination, played a role in causing the incriminating response. Thus appellant's challenge to the other questions posed by Officer Donoway has not been preserved for appellate review. *See* Maryland Rule 8–131(a). Nevertheless, we will consider all of the questions posed by Officer Donoway to appellant as a part of our consideration of the totality of the circumstances.

Officer Donoway was not involved in the investigation of the robberies at Fratelli's restaurant either before or after the transport of appellant to the Sheriff's Office. She was working at the airport when she was told to transport "a subject" to the Sheriff's Office. Officer Donoway did not know appellant's name and was not familiar "with [appellant] or anything that was going on at Fratelli's."

During the transport, appellant displayed extreme mood swings—he "became very angry and upset using profanity" and then "he seemed like he was going to pass out." He kept going back and forth between the extremes. When appellant acted like he was going to pass out, Officer Donoway asked him if he was okay. The purpose of the question was to determine if Officer Donoway needed to take him to the hospital. Appellant answered "yes" (he was okay), and when they arrived at the Sheriff's Office, Officer Donoway told the detectives that appellant "was fine."

During the times that appellant was angry and using profanity, Officer Donoway tried to calm him down. She asked appellant, in effect, why was he upset. Appellant answered that he did not do anything and that he was going to jail. Officer Donoway then asked him, "I said, have you ever been arrested before *because, you know, that's something to consider if you haven't been arrested before.*" (Emphasis added). Officer Donoway testified that she was trying to make appellant "feel better," because if he did not have a record, "maybe things would work out better for him." Appellant responded, "yes, for taking a car. I can't keep doing this. I'm already in trouble. I'm going to jail. I did it."

It is clear that Officer Donoway's only job was to transport appellant to the Sheriff's Office; she played no role in the criminal investigation of the robberies at Fratelli's restaurant. During the transport, Officer Donoway was called upon to respond to appellant's behavior. Her questions were directed to finding out if appellant was okay when he appeared to pass out or to calming him down when he was angry and using profanity. Officer Donoway testified that she had no intention

of interrogating appellant during the transport for investigative purposes and that her purpose in speaking to appellant was not to obtain incriminating statements from him.

Regarding the precise question at issue, "have you ever been arrested before," we agree with the trial court that the question was "irrelevant" to the criminal investigation of the instant case, and that appellant's initial answer, "yes, for taking a car," was "certainly not inculpatory so far as this particular case is concerned because what is inculpatory here relates to the circumstances and facts of this case, not some other case ... for which he may have been arrested." After having answered Officer Donoway's question appropriately, appellant proceeded to spontaneously make four statements having nothing to do with the question, the last of which was "I did it."

After a consideration of the totality of the circumstances surrounding the transport of appellant to the Sheriff's Office by Officer Donoway, we cannot conclude that Officer Donoway should have known that her question to appellant, "have you ever been arrested before?," was "reasonably likely to elicit an incriminating response" from him. *See Innis*, 446 U.S. at 301, 100 S.Ct. 1682. Appellant's response, "I'm already in trouble. I'm going to jail. I did it," was "a classic 'blurt,' to which the protections of *Miranda* do not apply." *Prioleau v. State*, 179 Md.App. 19, 30, 943 A.2d 696 (2008), *aff'd*, 411 Md. 629, 984 A.2d 851 (2009). Accordingly, we hold that appellant's inculpatory statement did not result from "express questioning" in violation of *Miranda.*

## C.

### Voluntariness

As a second basis for error, appellant argues that his statements to Officer Donoway were not voluntary, "because his mental impairment prevented him from knowing or understanding what he was saying." Appellant further complains that "[t]he State offered no other testimony to prove voluntariness," and the court erred when it based its decision

regarding whether appellant's statements were voluntarily given "on Officer Donoway's conduct, rather than on [appellant's] demonstrated mental impairment." Appellant concludes that, because "[n]o other evidence supported the trial court's voluntariness finding[,] . . . the statements should have been suppressed." Appellant's argument is without merit.

When a defendant properly challenges the voluntariness of a confession or inculpatory statement in a pre-trial motion, the burden is on the State to affirmatively show voluntariness by a preponderance of the evidence. *Harper v. State,* 162 Md.App. 55, 72, 873 A.2d 395 (2005). " 'The trial court's determination regarding whether a confession was made voluntarily is a mixed question of law and fact.' " *Knight v. State,* 381 Md. 517, 535, 850 A.2d 1179 (2004) (quoting *Winder v. State,* 362 Md. 275, 310–11, 765 A.2d 97 (2001)). We review the trial judge's ultimate decision on the issue of voluntariness *de novo. Id.* "We do not look, however, at the trial record for additional information, nor do we engage in *de novo* fact-finding." *Id.*

In order to be deemed voluntary, a confession must satisfy the mandates of the State and Federal Constitutional provisions as well as Maryland non-constitutional law. *Id.* at 532, 850 A.2d 1179. The " 'totality of the circumstances' [ ] governs the analysis of voluntariness under the State and Federal Constitutional provisions.' " *Griner v. State,* 168 Md. App. 714, 734, 899 A.2d 189 (2006) (quoting *Burch v. State,* 346 Md. 253, 266, 696 A.2d 443 (1997)). The test requires us to

> "look to all of the elements of the interrogation to determine whether a suspect's confession was given freely to the police through the exercise of free will or was coerced through the use of improper means. On the non-exhaustive list of factors we consider are the length of the interrogation, the manner in which it was conducted, the number of police officers present throughout the interrogation, and the age, education and experience of the suspect."

*Harper,* 162 Md.App. at 72–73, 873 A.2d 395 (quoting *Winder v. State,* 362 Md. 275, 307, 765 A.2d 97 (2001)). Thus, "[o]rdi-

narily, the voluntariness of the defendant's inculpatory statement is determined based on a totality of the circumstances test." *Harper*, 162 Md.App. at 72, 873 A.2d 395.

Maryland non-constitutional law, however, " 'requires that "no confession or other significantly incriminating remark allegedly made by an accused be used as evidence against him, unless it first be shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary." ' " *Harper*, 162 Md.App. at 73, 873 A.2d 395 (quoting *Winder v. State*, 362 Md. 275, 307, 765 A.2d 97 (2001)). Under Maryland non-constitutional law a confession is involuntary when a defendant "is so mentally impaired that he does not know or understand what he is saying," or when the confession "is induced by force, undue influence, improper promises, or threats." *Hoey v. State*, 311 Md. 473, 482–83, 536 A.2d 622 (1988).

There is no evidence of force, threats, improper promises, or coercion of any kind. Appellant only challenges his statements under Maryland non-constitutional law because he claims that his mental impairment prevented him from knowing or understanding what he said. Accordingly, the " 'crucial question' " becomes " 'whether [appellant's] disclosure[ ] to the police w[as] freely and voluntarily made at a time when he knew and understood what he was saying.' " *Id.* at 482, 536 A.2d 622 (quoting *Wiggins v. State*, 235 Md. 97, 102, 200 A.2d 683 (1964)). " 'Whether [appellant] was under the influence of a drug at the time of giving the incriminating statement is a factor to be considered in determining the voluntariness of that statement.' " *Harper*, 162 Md.App. at 83, 873 A.2d 395 (quoting *Hof v. State*, 337 Md. 581, 620, 655 A.2d 370 (1995)).

In the instant case, Officer Donoway acknowledged that appellant "went from moments of outrage to anger . . . to where he acted like he was going to pass out" and that appellant "was not acting in his right mind." Nevertheless, appellant responded directly and appropriately to Officer Donoway's questions. Appellant answered "yes" to the question, "are you okay?" When asked whether he had been arrested

before, appellant answered "yes, for taking a car." Appellant's responses to Officer Donoway's questions convinced Officer Donoway that appellant was okay and that he was not in such a condition that he had to be taken to the hospital. In fact, upon arriving at the Sheriff's Office, Officer Donoway informed the detectives that appellant "was fine." Accordingly, we conclude that the State met its burden of proving, by a preponderance of the evidence, that appellant was not so mentally impaired that he did not know what he was saying or understand what was being said to him.

When considering the totality of the circumstances under the State and Federal Constitutional provisions, we also conclude that appellant's statements were voluntary. Appellant was being transported to the Sheriff's Office by one officer who had no knowledge of appellant or the crime under investigation; appellant had been arrested before and thus was familiar with the process; he correctly answered the questions posed to him and his answers demonstrated that he understood the severity and consequences of his actions; and Officer Donoway was not forceful or vociferous, but rather attempted to ease some of appellant's concerns and calm him down. Based on the totality of the circumstances, we are persuaded that appellant freely confessed to Officer Donoway that he committed the burglary. Therefore, the motions judge did not err in denying appellant's motion to suppress.

## II.

### Examination of Two Witnesses

Appellant argues that the trial court "infringed on [appellant's] right to present a full defense by not allowing him to introduce evidence implicating third-party guilt," which was the defense theory at trial. First, appellant contends that the court improperly limited defense counsel's examination of Sakellis regarding whether he ever suspected that Saul Hernandez, a former employee of Fratelli's, committed the burglary, when there was "a police report recording Sakellis's suspicions." Appellant insists that the excluded evidence was more

than a "blind allegation," and its weight "was for the jury to decide." Second, appellant argues that "the trial court abused its discretion by not allowing the defense to question [Ruperto] about the burglaries," when there was evidence that Ruperto "was a plausible alternative suspect in the burglaries." Appellant also asserts that the court's erroneous exclusion of evidence implicating Hernandez and demonstrating Ruperto's involvement in the burglaries was not harmless beyond a reasonable doubt. We disagree and explain.

## A.

### Standard of Review

 "The Confrontation Clause of the Sixth Amendment and Article 21 of the Maryland Declaration of Rights guarantee a defendant in a criminal case the right to confront the witnesses against him." *Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974 (1996). This right, however, is limited by the trial court's discretion "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* (internal quotations omitted). Therefore, "the scope of examination of witnesses at trial is a matter left largely to the discretion of the trial judge and no error will be recognized unless there is clear abuse of discretion." *Thomas v. State,* 143 Md.App. 97, 110, 792 A.2d 368 (internal quotations omitted), *cert. denied,* 369 Md. 573, 801 A.2d 1033 (2002).

Limitation of cross-examination should not occur, however, until after the defendant has reached his constitutionally required threshold level of inquiry. Stated another way, although the scope of cross-examination is generally limited to the subjects raised on direct examination, within that limit a defendant should be free to cross-examine in order to elucidate, modify, explain, contradict, or rebut testimony given in chief. It is also proper to cross-examine as to facts or circumstances inconsistent with testimony, and to bring

out the relevant remainder or whole of any conversation, transaction, or statement brought out on direct questioning. Finally, and particularly pertinent to the instant case, one should be allowed to cross-examine in order to determine the reasons for acts or statements referred to on direct examination.

*Smallwood v. State,* 320 Md. 300, 307, 577 A.2d 356 (1990) (citations and internal quotations omitted). The trial court thus conducts a "balancing test:" the trial court "must allow a defendant wide latitude to cross-examine a witness as to bias or prejudices, but the questioning must not be allowed to stray into collateral matters which would obscure the trial issues and lead to the factfinder's confusion." *Id.* at 307–08, 577 A.2d 356 (citation omitted).

## B.

### Sakellis

In his brief, appellant states that, immediately following the first burglary, Sakellis told police that he suspected that Hernandez had committed the first burglary. Appellant now complains that the court should have allowed him to question Sakellis regarding this statement and present the police report to the jury.

At trial, defense counsel inquired into this matter during the cross-examination of Sakellis. Defense counsel asked Sakellis whether anyone by the name of Saul Hernandez had ever worked for him, and Sakellis responded, "No." Defense counsel pressed the issue further and the following ensued:

[DEFENSE COUNSEL]: Your testimony today is that you didn't speak to law enforcement officers on the 23rd day of June and told them that you suspected that Saul Hernandez had committed the burglary?

[PROSECUTOR]: Objection.

Move to strike.

THE COURT: Basis?

[PROSECUTOR]: It's not relevant.

THE COURT: All right.

[DEFENSE COUNSEL]: Your Honor, my theory is that someone other than [appellant] committed this crime. One of those suspects who could have been considered—

[PROSECUTOR]: Objection.

[DEFENSE COUNSEL]: Permission to approach?

THE COURT: All right.

(Whereupon, counsel approached the bench, and the following ensued.)

[DEFENSE COUNSEL]: I have in my possession a report that was generated by a law enforcement officer on the 23rd day of June that indicates that [ ] Sakellis told that officer that he suspected that person—

[PROSECUTOR]: Keep your voice down, please.

[DEFENSE COUNSEL]: A person by the name of Saul Hernandez who had previously worked for Fratelli's had committed this crime.

[PROSECUTOR]: It's based on pure blind speculation. Absolutely no proof whatsoever to make that allegation even if he did.

THE COURT: Yes.

I will sustain the objection.

Later in the trial, defense counsel asked the trial court to revisit this issue:

[DEFENSE COUNSEL]: Had I been permitted to, I would ask some [ ] further follow-up questions on a subject of [ ] Hernandez based on a report I received. My understanding is that [ ] Sakellis told the police officer who responded on the date of the first burglary that he believed that [Hernandez], a Hispanic employee who had worked for him for a few days had committed this crime.

[ ] Sakellis indicated that he had employee papers with [Hernandez's] information on his desk and that Sakellis said that [Hernandez's] employee information was also missing.

* * *

[PROSECUTOR]: Also, I want on the record, Your Honor, that he gave absolutely no foundation for drawing that conclusion.

THE COURT: Well—

[PROSECUTOR]: And has testified here today that nothing else was missing except the money.

THE COURT: Well, I understand.

It seems to me . . ., what is the purpose for which you want to pursue this line of inquiry?

[DEFENSE COUNSEL]: I just want to develop as many plausible alternative suspects as I can for [appellant's] benefit. We have fingerprint testing that was available in the sense that there were fingerprints suitable for comparison found that were not compared to anyone beside my client under circumstances where [ ]. Sakellis believed that this person may have been involved because certain items were taken during the course of the burglary.

I believe that he is a plausible alternative suspect who should have been investigated, was not investigated, and is to the detriment to my client, that's the only reason I am making an issue out of it.

THE COURT: All right.

You are not seeking to ask these questions from the impeachment standpoint. You are not trying to impeach [ ] Sakellis, but only to show that there is another plausible suspect who was not—

[DEFENSE COUNSEL]: That's the purpose, yes.

THE COURT: Okay.

All right.

Well, I will sustain the objection.

Based on our review of the record, we agree with the State that appellant's allegation that Hernandez was a suspect "lacked any foundation." Defense counsel clearly stated that the purpose of his inquiry was not to impeach Sakellis; it was

"to develop as many plausible alternative suspects ... for [appellant's] benefit." The record, however, fails to support appellant's proffer as to what Sakellis' proposed testimony would have been. Sakellis had already testified that Hernandez never worked for him and that nothing was missing from the restaurant after the first burglary, except the money. Thus Sakellis had denied the very facts that appellant was seeking to elicit from him. Absent a factual predicate for defense counsel's further questioning regarding Hernandez's connection to the burglary, the court's allowance of the requested cross-examination would have served only to confuse the jury. *See Smallwood*, 320 Md. at 307, 577 A.2d 356. Therefore, the court did not abuse its discretion in sustaining the prosecutor's objection.[3]

## C.

### Ruperto

 Defense counsel also called Ruperto as a witness to establish that Ruperto was a plausible suspect with respect to the burglaries and the firearm counts. Prior to Ruperto's taking the stand, Ruperto's counsel informed the court that Ruperto intended to invoke his Fifth Amendment privilege against self-incrimination in response to all questions. The court permitted defense counsel to question Ruperto regarding his involvement in the burglaries outside the presence of the jury. In response to all questions, Ruperto exercised his Fifth Amendment privilege against self-incrimination. The court then permitted defense counsel to question Ruperto in front of the jury concerning the handgun recovered from under the driver's seat of appellant's Honda. Ruperto exercised his Fifth Amendment privilege as to all questions asked regarding the handgun. Appellant asserts that the court erred in refusing to allow defense counsel to question Ruperto about the burglaries before the jury.

---

**3.** We agree with the State that "[t]he fact that this statement was included in a police report makes this evidence no more relevant particularly where the statement may not have been accurate."

We need not address the merits of appellant's contention because, even assuming an abuse of discretion, appellant was clearly not prejudiced by the court's ruling. *See Nottingham Vill., Inc. v. Balt. County,* 266 Md. 339, 356, 292 A.2d 680 (1972) (noting that the trial court's decisions regarding matters concerning the nature and scope of cross-examination will only be disturbed upon a showing of a prejudicial abuse of discretion). After Ruperto asserted his Fifth Amendment privilege before the jury, he was taken to a holding cell where he admitted to Deputy Walker that the handgun was his. Defense counsel was allowed to reopen his case and call Deputy Walker as a witness. Deputy Walker testified that Ruperto told him in broken English, "gun mine, charges mine, he's innocent." Because Ruperto's confession to the gun and the "charges" was before the jury, we conclude that appellant has not shown prejudicial abuse of discretion occasioned by the refusal of the trial court to allow defense counsel to question Ruperto about the burglaries before the jury.[4]

**JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**

ADKINS, J., dissenting.

I respectfully dissent from the majority's holding that Officer Donoway's questions to Rodriguez did not violate Rodriguez's *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). I believe that Officer Donoway violated Rodriguez's *Miranda* rights the moment that her dialogue with him shifted from general inquiries about his well-being to specific inquiries about his prior arrest record.

The Supreme Court's decision in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), defined the meaning of "interrogation" for *Miranda* purposes. The rule

---

4. Defense counsel did not ask to recall Ruperto to the witness stand after learning of his confession.

in *Innis* is clear: "interrogation" includes both "express questioning" by a law enforcement officer and also "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 301–02, 100 S.Ct. at 1689–90 (emphasis removed). The majority interprets *Innis* in light of the Court of Appeals's decision in *Prioleau v. State*, 411 Md. 629, 984 A.2d 851 (2009), to hold that Donoway's questioning of Rodriguez did not violate his *Miranda* rights. In that case, the Court of Appeals held that defendant Maurice Prioleau's *Miranda* rights were not violated when a detective asked Prioleau "[w]hat's up, Maurice?" at the scene of Prioleau's arrest. *Prioleau*, 411 Md. at 632, 984 A.2d at 852. The Court stated that it was not reasonably likely that the detective's greeting in that case would elicit an incriminating response. *See id.* at 651, 984 A.2d at 864.

In my opinion, the majority construes *Prioleau* far too broadly. In the present case, Donoway's comments are by no means as innocuous as those at issue in *Prioleau*. Had Donoway gone no further than repeated inquiries into whether Rodriguez was "okay," she would not have run afoul of *Miranda*. Instead, she chose to question Rodriguez as to his past history with law enforcement and arrests, a topic that had nothing to do with calming him down, as she claimed, and everything to do with evoking a conversation about his problems with the law, including the circumstances of his present arrest.

Donoway's question to Rodriguez is clearly distinguishable from the question posed in *Prioleau*, which was permissible in part because it did not involve "a question on anything that [involved] illegal activity." *Prioleau*, 411 Md. at 651, 984 A.2d at 864. Regardless of whether Donoway was credible in explaining that she had no intention of eliciting incriminating statements from Rodriguez through her questioning, her remarks do not pass muster under the objective standard imposed by *Innis*. 446 U.S. at 301–02, 100 S.Ct. at 1689–90.

Because Donoway's questioning of Rodriguez was unconstitutional interrogation under *Miranda*, Rodriguez's statements to the officer should be suppressed. I would vacate Rodriguez's conviction, and remand the case to the trial court for a new trial without this evidence.